[No. B216270. Second Dist., Div. Four. Feb. 22, 2010.]

In re CHRISTOPHER C. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v.
CRAIG C., Defendant and Appellant.

**COUNSEL**

Janice A. Jenkins, under appointment by the Court of Appeal, for Defendant and Appellant.

James M. Owens, Assistant County Counsel, and Timothy M. O'Crowley, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**SUZUKAWA, J.**—Craig C. (Father) appeals from the jurisdictional and dispositional orders issued by the juvenile court. He contends the petition fails to state a cause of action and there is insufficient evidence to sustain the court's jurisdictional findings. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and his ex-wife E.C. (Mother)[1] are the parents of seven children: a son, Christopher (born in 1994), twin sons, William and Kyle (born in 1999), and quadruplets, Brittany, Heidi, Collette, and Wesley (born in 2001). The family has been the subject of 30 referrals to the Los Angeles County Department of Children and Family Services (DCFS). Three led to voluntary family maintenance services and one led to a dependency court case in 2004.

The family came to the attention of DCFS in the current case in October of 2008. As the investigation unfolded, some of the children alleged that Father sexually abused them and that their siblings engaged in substantial sexual conduct. One accused his brother of sexually abusing him in Father's presence. The children who did not accuse Father of abuse claimed that Mother physically abused them and coached them to tell lies against Father. What followed was a series of inconsistent statements that left the juvenile court at a loss when it tried to determine whether any of the allegations were true.

In October, after Mother reported to police that William told her that he saw Father and Christopher having sex, officers interviewed the children. William reported that he saw Father's penis and Christopher's buttocks while both were naked in bed. Collette claimed to have seen Christopher and Father "naked under the blanket doing nasty stuff."

When asked whether Father had ever touched him inappropriately, William said that no one had ever touched his private parts. Heidi and Brittany denied sexual abuse by Father; however, Collette said Father touched her vagina over her clothing.

A police detective who was present when the children were interviewed in October believed that Mother was coaching them. Relying on past claims of

---

[1] She is not a party to this appeal.

sexual abuse reported by the family and on the subsequent investigations, the detective opined that Mother had a pattern of bribing the children to get them to do as she wanted. The detective noted that at the station the children were more interested in the hamsters that Mother had just bought them. The detective told the social worker, "[D]uring the interviews with all of the kids, they just seemed . . . disinterested. I would think that children that have been through what these allegations are saying would be withdrawn and concerned about what they were talking about. These kids weren't withdrawn. They just spoke like they knew what to say and they just didn't seem interested." The officer who conducted the October interviews concurred with the detective's assessment.

A social worker also interviewed the children that day. William told her that he saw Father place his penis in Christopher's rectum. He said that Father forced Christopher to shave his legs and wear women's clothing. Even though William had told the police that no one had ever touched his private parts, he informed the social worker that Father had done so. He also accused Christopher of trying "to touch his private places." William said that he really wants Father to go to jail.

Christopher denied Father had sexually abused him. Although Christopher acknowledged that he dressed like a woman, he said that was his choice.

Brittany told the social worker that Father had touched her private parts during a visit which had occurred two weeks prior. According to the social worker, the child "changed her story throughout the interview and took excessive time to answer the questions."

During the December 2008 interviews with another social worker, William, Kyle, Collette, Brittany, and Heidi all disclosed sexual abuse by Father. The social worker noted that when Kyle, Collette, and Heidi were interviewed by another worker in October, they denied being abused by Father.

The children, with the exception of Christopher, underwent forensic sexual abuse exams. The results were normal. Christopher, who consistently denied that he had been the victim of sexual abuse, refused to be examined.

In January, the children were interviewed at the Child Abuse Crisis Center at Harbor-UCLA Medical Center. William then denied he had been sexually abused by Father, but repeated his claim that he had observed Father and

Christopher engaging in sexual activity. He said Father takes off his clothes and does something disgusting to Christopher. When asked what "something" meant, William replied, "He [Father] gets on Christopher and goes up and down on top of him." William claimed that Father threatened to hurt him if he told anyone about what Father and Christopher were doing. William said he reported the threat to his babysitter, who called an off-duty police officer. According to William, the officer arrived at Father's house and saw Father and Christopher naked. William also alleged that Christopher sodomized him on two occasions and Kyle witnessed one of the acts.

Kyle maintained that Father touched and squeezed his penis. He said Father touched him "in places that I really don't want him to touch." Kyle alleged that Father threatened to kill him if he told anyone about the touching.

Brittany said Father had touched her vaginal area over and under her clothing, which caused her to bleed and experience pain. The evaluator who spoke to Brittany noted she had "a limited ability to provide a coherent narrative [or] minimal contextual details" and that she "required prompting" to elaborate on her brief replies. At one point in response to a question she said, "I don't know the rest." When the evaluator pointed out that Brittany had given different answers (at first, she said Father touched her over her clothing and later claimed he had done so under her clothing), Brittany responded, "Wait. I messed up." She reported that Father also touched Heidi, Wesley, and Christopher.

Collette stated that Father touched her private parts over her clothing. She said, "[H]e touches me hard, and then I [get] blood there." Collette also claimed she saw Father touch Wesley inappropriately.

A week later, the social worker went to the school the quadruplets attended to conduct separate interviews in a more neutral setting. Wesley said that Mother told him to lie about Father touching their private parts. Wesley alleged that Mother hits the children with a back scratcher and a metal stick that used to be part of a broom. He claimed that on the previous day, Mother hit Heidi on the head with the metal stick. Wesley disclosed that he saw Collette suck Kyle's and William's penises and the three engage in sexual intercourse.

Heidi said Mother "told me to tell them that daddy touched me on my private parts, but he doesn't." She alleged Mother also told William and Kyle

to lie. Heidi stated that Mother hit her on the head with the metal broomstick and also abused Brittany by pulling her hair. Heidi repeated Wesley's claim regarding the sexual activity engaged in by Collette, Kyle, and William.

Father denied the sexual abuse allegations and accused Mother of coaching the children. Mother denied telling the children to fabricate the sexual abuse claims and physically abusing them.

On January 14, 2009, DCFS filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b), (c), (d), and (j), alleging physical abuse by Mother and sexual abuse by Father.[2]

In a later interview in January, although William and Kyle continued to allege that Father and Christopher had engaged in some form of inappropriate behavior, William did not want to talk about it and Kyle could not describe what he saw.

Mother claimed that she heard Christopher saying to Father on the telephone, "What, you want me to go home just so I can be your wife?"[3] When she asked him if Father had done anything to him, Christopher would not answer. However, he did tell her to "do something so William doesn't go back to dad's house. And don't let Kyle go because he's going to be next."

In her jurisdiction/disposition report, the social worker wrote that it was difficult to ascertain whether the sexual abuse allegations were true. She noted that the children made inconsistent statements, reporting sexual abuse to one social worker and denying it occurred to another. She referred to past allegations of similar conduct which led to inconclusive findings.

With respect to the family's history with DCFS the social worker wrote: "It is also worth noting that in reviewing the extensive history of referrals . . . (a total of 30 prior referrals), starting from 9/18/2000 to the present, there is an obvious presence of serious emotional distress among all of the children resulting from the parents' bitter custody battle." She pointed out that the children's reports of their parents' treatment of them shifted back and forth between favoring Father and Mother. The worker concluded: "It is tremendously disturbing that the immense discord between the mother and father

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] When Christopher spoke to the social worker, he denied making this statement.

has continued for so many years despite the obvious adverse effects that their broken relationship has had on each of the children. In an interview with the father, father described the child William as having 'a fractured mind' as a result of the mother's relentless manipulation. After a thorough review of this family's history, it is clear that each of the seven children have, in the past, and now continue to suffer with fractured minds due to the parents' juvenile ways."

On March 25, 2009, the court began the contested jurisdiction hearing. After receiving DCFS's reports into evidence, it heard Christopher's testimony.

Christopher denied having any inappropriate contact with Father. Nor did he have knowledge of such contact between Father and any of his siblings. In 2008, he saw Mother strike the quadruplets. She would slap them, pull their hair, throw them on the floor, and hit them with a back scratcher. Christopher admitted saying to Father during a telephone conversation, "I don't want to be your wife anymore." However, he claimed that Mother suggested that he make the comment. Christopher testified he moved out of Father's house and into Mother's in order to record her when she hit his siblings. He said he told Father about his plan and Father bought him the tape recorder and tape.[4] He claimed that he ran away from Mother's home because he could no longer take the emotional abuse, which he described as her making fun of him, forcing him to clean, and calling him names. He also "couldn't take seeing the kids getting hit anymore." Christopher stated that after he left Mother's home, he stayed at a friend's house before his social worker placed him in a shelter.

William testified that he stopped visiting Father in January 2008 because Father was touching him and Kyle. He explained that Father only touched him while they were driving in a car. William claimed that while he sat next to Father in the front seat, Father would put his hand next to William's private part. He stated Father touched Kyle in the same way. William denied Mother told him to say anything about Father. He said Mother did not hit him. He asserted Mother did not hit any of the children and his siblings did not tell him that she had done so. He said Father hit him, sometimes with a closed fist. William told the court he would not be "okay" with living with Father or Christopher and he wants to live with Mother. He claimed Christopher took his and William's clothes off and got on top of him in Father's presence. William said he saw Father "humping" Christopher by "putting his private part into Christopher's butt."

---

[4] He later testified Father purchased the tape recorder without knowing of his plan.

William admitted telling a social worker that he wanted Father to go to jail. When asked why, he replied, "I don't want to talk about it." He said the subject made him uncomfortable. He gave the same response on several occasions.

Kyle took the witness stand. He recalled telling a social worker that Father was touching his private parts. He demonstrated where Father touched him by pointing to his groin and rectum. Kyle said Father would call him up to Father's bedroom and start touching him when he got into the room. Kyle said the last time Father touched him, he, William, and Christopher ran from the house. Christopher told Kyle that if Father touched him again Kyle was to tell him. Kyle claimed Father never touched him while they were in the car, and Father always touched him over the clothing. He said he did not see Father touch William. Nor did he ever see William sit in the front seat of Father's car.[5]

Kyle stated Mother did not tell him to say bad things about Father. He denied that Mother struck him or his siblings. Nor did his siblings complain to him that she had. When asked if he loved Father, he said, "I don't know."

The court recessed the hearing, stating that the quadruplets would testify the next day.

The next day, March 26, the court noted that it had met with counsel for the parties in chambers. Their discussion was not on the record. The court stated it was not sure what the posture of the case was at that point. The following colloquy took place:

"[Mother's counsel]: Your Honor, at this point I'm willing to rest and submit based on the court's indicated in chambers.

"The Court: All right.

"[Mother's counsel]: And to address the court's concerns, we would stipulate that the court may conform the petition to its findings, to the evidence.

---

[5] William and Kyle also told social workers and testified that Father and Christopher forced them to view pornographic material on Father's computer, a charge Father and Christopher denied.

"The Court: So you're waiving any notice if the court amends to conform to proof?

"[Mother's counsel]: Yes, waive notice.

"The Court: All right. Thank you. . . .

"[Father's counsel]: And Your Honor, I'm waiving the notice as well. After conferring with my client, we've agreed that we will rest as well and have the court make its findings.

"The Court: All right. So all parties are resting on the court's tentative; am I correct?"

Counsel for DCFS and counsel for William and Kyle answered yes.

Without objection, the court amended the petition by interlineation to add the following allegation pursuant to section 300, subdivisions (b) and (c). "There exists a severe dysfunction within this family resulting in an ongoing & severe family law conflict, resulting in cross allegations of sexual abuse, physical abuse, [and] 'coaching' and there also exists evidence of the failure of the mother and father to properly supervise the children, all of which places the children at risk of serious physical and emotional harm."

Prior to making its findings, the court discussed the long history of discord within the family. It made a specific reference to the toll the task of providing testimony took on Christopher, William, and Kyle. It noted that virtually every professional who had contact with the parents concluded they were in an "alternative universe" that infected the family. The court noted the tortured and conflicting testimony offered by the children and concluded, "[t]hey are so damaged by this ongoing fight that they don't even know what's true and not true anymore. And that's just obscene. What the court does know, and what the court can say very clearly in this case, is that there is a severe dysfunction in this family between the mother and the father. And that's a result of an ongoing, severe family-law conflict which has resulted in cross-allegations of sexual abuse, physical abuse, coaching, to the point where, as the court's indicated, it's really irrelevant as to whether it's true or not. The fact that it exists on this level and to this extent is damaging to the children and puts them at risk. Additionally, to whatever extent, this dysfunction has resulted in neither parent being properly able to supervise their children. And that places these children not just at risk of physical harm, but serious physical harm and, more importantly, serious emotional harm. And I think that that would be sufficient for the court to sustain the (b) and (c) on that language under Welfare and Institutions Code section 300."

With the exception of Christopher, who was allowed to remain in Father's home, the court ordered the children placed in the care of DCFS. It ordered reunification services for the parents, which included psychotherapy, counseling, and monitored visitation with the children in a neutral therapeutic setting. The children were to be provided with counseling with a licensed therapist and Christopher was to continue with his individual counseling.

## DISCUSSION

I. *Father Forfeited His Claim That the Petition Fails to State a Cause of Action*

■ Father contends that the amended petition did not state a cause of action under either subdivision (b) or (c) of section 300. DCFS argues Father forfeited the claim by failing to object in the trial court. We agree with DCFS.

Father does not dispute that he failed to object, waived notice of the amendment, and did not demur to the petition as amended. He urges, however, that there is a split of authority with respect to whether a failure to challenge the sufficiency of the petition in the lower court forfeits the right to raise the issue on appeal and asks that we follow the single case that supports his view, *In re Alysha S.* (1996) 51 Cal.App.4th 393 [58 Cal.Rptr.2d 494].

■ In that case, the Third District cited Code of Civil Procedure section 430.80, subdivision (a), which provides that a party who fails to demur to a complaint or cross-complaint in the trial court waives the objection, unless the objection raised on appeal is that the pleading does not state a cause of action. (*In re Alysha S., supra*, 51 Cal.App.4th at p. 397.) Without further analysis, it concluded: "The same rule obtains herein." (*Ibid.*)

One case, *In re Shelley J.* (1998) 68 Cal.App.4th 322, 328–329 [79 Cal.Rptr.2d 922], expressly disagreed with the holding in *In re Alysha S.* Two cases, one from this district, *In re James C.* (2002) 104 Cal.App.4th 470 [128 Cal.Rptr.2d 270], and one from the Fourth District, *In re S. O.* (2002) 103 Cal.App.4th 453 [126 Cal.Rptr.2d 554], agreed with the holding in *In re Shelley J.* The most recent case to examine the issue, *In re David H.* (2008) 165 Cal.App.4th 1626 [82 Cal.Rptr.3d 81], agreed with the holdings of these three cases, albeit for different reasons.

The *In re David H.* panel noted that the rule of court relied upon by the *In re Shelley J.* and *In re James C.* courts, former rule 39 of the California Rules of Court, has been repealed and the current version of the rule does not contain the language the two courts cited. (*In re David H., supra*, 165 Cal.App.4th at p. 1638.) In addition, the court departed from the view stated in *In re Shelley J.*

that, " 'Unless otherwise specified, the requirements of the Civil Code and the Code of Civil Procedure do not apply [to dependency proceedings]. [Citations.]' " (*In re Shelley J., supra*, 68 Cal.App.4th at p. 328, quoting *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 711 [17 Cal.Rptr.2d 759].)

The *In re David H.* court gave two reasons for concluding that the provision of Code of Civil Procedure section 430.80 that allows a challenge to the facial sufficiency of a petition to be raised for the first time on appeal does not apply to dependency proceedings. "First, section 430.80 appears in part 2 of the Code of Civil Procedure, which applies to civil actions, not in part 3, which applies to special proceedings. Thus, it does not even apply to juvenile dependency proceedings by its own terms." (*In re David H., supra*, 165 Cal.App.4th at p. 1640.) "Second, the statute is inconsistent with the purposes of juvenile dependency law. Allowing parties to challenge the facial sufficiency of a petition for the first time on appeal conflicts with the emphasis on expeditious processing of these cases so that children can achieve permanence and stability without unnecessary delay if reunification efforts fail. [Citation.] Enforcing the forfeiture rule requires parties to raise such issues in the juvenile court where they can be promptly remedied without undue prejudice to the interests of any of the parties involved. [Citations.]" (*Ibid.*) We agree. We conclude Father forfeited his claim by failing to demur to the petition in the trial court.

 Moreover, even assuming the petition failed to state a prima facie case, Father cannot establish prejudice. The purpose of the petition is to give a parent adequate notice of the allegations against him or her. (See *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1036–1037 [113 Cal.Rptr.2d 597].) There is no question that the court amended the petition after discussing the matter in chambers with the attorneys, who in turn conversed with their clients. After the court announced how it was going to amend the petition, no party objected or claimed to be confused. Indeed, Father does not claim he was misled in any way by the amendment.

## II. *Sufficiency of the Evidence*

 Father asserts the evidence is insufficient to sustain the juvenile court's jurisdictional findings. He claims there is nothing in the record to support the conclusion that the children have suffered or are in danger of suffering serious physical harm (§ 300, subd. (b)) or that they are suffering or at substantial risk of suffering serious emotional damage (§ 300, subd. (c)). "We address only the latter, since the juvenile court's jurisdiction may rest on a single ground." (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127 [93 Cal.Rptr.3d 418].)

"On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value. [Citation.]" (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185 [68 Cal.Rptr.3d 465].)

Father concedes, "[t]here is sufficient substantial evidence in this case that the parents engaged in offensive conduct as a result of the family law conflict." He asserts, "[w]hat is missing here, however, is evidence that the parents' offensive conduct places any of the children [at] a substantial risk of serious emotional harm." We disagree.

Father greatly minimizes the emotional suffering his children have experienced due to their parents' tug of war for their affections. The family history of DCFS intervention alone (30 referrals) certainly suggests the children are at substantial risk of suffering serious emotional harm. As several of the children noted, it was a daunting task to be constantly questioned about subjects they did not want to talk about or to be subjected to physical examinations. William became more withdrawn as he testified, refusing to answer questions. Christopher twice refused to be examined by doctors, explaining, "I refuse to prove something I already deny." During Brittany's interviews, the social workers noted that she had great difficulty discussing the matter, as it appeared that she was attempting to memorize a script. The police officers who spoke to the children in October cited a past history of claims within the family and concluded the children had become accustomed to blithely accusing family members of serious abuse without regard for the truth.

The court noted that the constant coaching of the parents caused the children to be unable to distinguish reality from fiction. The record is replete with inconsistent allegations of sexual and physical abuse. Oftentimes, the children would provide conflicting versions of events in the same interview. As Christopher told the evaluator at the Child Abuse Crisis Center, Mother "programs" or "brainwashes" his siblings into making allegations. "She would tell me over and over what to say, the drill factor." She taught him to say, "My dad hits me. My dad curses. He drinks."

This regimen of psychological warfare cannot help but subject the children to a substantial risk of emotional harm. One need only refer to the recommendations of the evaluators at the Child Abuse Crisis Center to conclude that there is substantial evidence showing the children fall within the parameters of section 300, subdivision (c). Nine-year-old William and Kyle and seven-year-old Collette alleged their Father sexually abused them. The evaluator

recommended that all participate in mental health counseling with a therapist qualified to work with children who have reported sexual abuse. Seven-year-old Brittany's inability to provide a "coherent narrative" of Father's alleged sexual abuse was thought to be a product of "anxiety . . . and over-interviewing." In addition, the evaluators recommended that the children participate in family counseling to address issues relating to their parents' divorce.

Father's reliance on *In re Brison C.* (2000) 81 Cal.App.4th 1373 [97 Cal.Rptr.2d 746] is misplaced. In that case, the Court of Appeal reversed the dependency court's jurisdictional order based on its finding that the child had suffered or was in significant danger of suffering serious emotional damage. As in our case, the child was caught in the middle of a dispute between his parents. As relevant here, the panel discussed whether the child was in danger of suffering serious emotional damage if jurisdiction was not assumed. In concluding he was not, the court noted that "[b]oth parents have recognized the inappropriateness of their past behavior and of commenting to Brison about the other. They have expressed a willingness to change their behavior patterns and to attend counseling and parenting classes." (*Id.* at p. 1381.) Significantly, the court found there was no evidence the parents were "incapable of expressing their frustration with each other in an appropriate manner." (*Ibid.*)

██ In contrast, as is evident from this family's history, the parents have turned a blind eye to the substantial risk of emotional damage to the children that their conduct has spawned. Unlike the child in *In re Brison C.*, the children in our case are in the midst of the turmoil that threatens their emotional well-being. While we agree that "[t]he juvenile courts must not become a battleground by which family law war is waged by other means" (*In re John W.* (1996) 41 Cal.App.4th 961, 975 [48 Cal.Rptr.2d 899]), substantial evidence supports the juvenile court's finding that the children are at substantial risk of becoming casualties of the family's longstanding attacks on one another. Not only are the parents pitted against one another, but the children, with their various accusations, are also at odds with each other. As the court concluded, it is quite unusual and disconcerting to see children having no difficulty falsely accusing their siblings of sexually abusing them and claiming other siblings are engaging in oral copulation and intercourse. We are satisfied that when, as here, children are at substantial risk of emotional harm as a result of being utilized as weapons in an ongoing familial fight, the dependency court properly exercises its jurisdiction and declares them dependent children.

## DISPOSITION

The juvenile court's orders are affirmed.

Epstein, P. J., and Willhite, J., concurred.