Filed 3/17/15  In re K.P. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re K.P., a Person Coming Under the Juvenile Court Law. | |
| S.D. COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D066509 |
| Plaintiff and Respondent, | (Super. Ct. No. J518806) |
| v. | |
| S.O., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Beth Ploesch, under appointment by the Court of Appeal, for Minor.

S. O. (mother) appeals a juvenile court order granting sole legal custody of her daughter, K.P., to K.P's father, C. P. (father), contending the court did not comply with notice requirements under the Indian Child Welfare Act (ICWA), and it erred by granting father sole legal custody. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

On October 8, 2013, the San Diego County Health and Human Services Agency (the Agency) petitioned on K.P's behalf under Welfare and Institutions Code[1] section 300 subdivision (b), alleging that mother had failed to protect K.P., who was then 11 months old. Under a Fourth Amendment waiver search, mother was found to be under the influence of a controlled substance, and drug paraphernalia was found in the family room and on the outdoor porch. Mother admitted using methamphetamine and heroin, including at home while K.P. was asleep. K.P. tested presumptively positive for opiates when she was detained into protective custody at the Polinsky Children's Center.

Mother claimed she had Native American ancestry, but told the social worker "it's not enough." Mother's mother told the social worker that their ancestors were from the Winnebago Sioux tribe in Decorah, Iowa. Mother told the social worker she did not want father involved in this matter, and he had not seen K.P. since she was five months old. Mother did not provide the Agency any information about father's residence except that it was "in Carlsbad somewhere."

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise specified.

At a hearing held before the Agency had located father, Mother stated she had not received child support from father, despite a court order to that effect. Mother said she did not have a tribal number or anything identifying her as belonging to the Winnebago Sioux tribe. Mother's mother told the court that someone in her family was affiliated with the tribe in the 1700's. The court stated, "You don't need a tribal number, but we just need enough information to know if we have a reason to believe the child may be an Indian child. And both of you are shaking your heads 'no.' " The court asked mother's mother whether she had any information that any family member was "involved with the tribe? Got services? Spoke the language? Lived on a reservation?" Mother's mother replied, "All I know is somebody down the line married an Indian princess." The court ruled without prejudice that notice was not necessary and the ICWA did not apply.

The court scheduled a settlement conference for November and trial for December. At the settlement conference, mother waived her right to a trial. The court found the allegations of the petition to be true, and set a contested disposition hearing for January 10, 2014.

In an addendum report, a social worker reported that on November 22, 2013, father contacted the social worker and stated he was unaware that K.P. was in custody. He had last tried to contact K.P. for her birthday in October 2013, but K.P. was with her maternal grandmother in Minnesota. He said that he and his fiancée were receptive to having K.P. placed with him. Moreover, mother had planned an informal meeting with him, mother and her mother to discuss permitting him to have partial custody of K.P. Father explained he had been in a serious motorcycle accident and was put on multiple

3

pain medications that were highly addictive; therefore he was currently receiving methadone treatment, which would end in two months.

After the social worker informed mother about the Agency's interview with father, mother said she did not want him to have custody of K.P, because K.P. had no relationship with him. Mother also questioned father's sobriety, stating he had used drugs five years earlier when they first met, and he was on methadone for his heroin use. The social worker stated: "[Mother] was asked if that were the case why was she in contact and attempting to arrange custody and visitation on her own accord versus going through this Agency where he can be screened and tested. [Mother] did not have a reply."

The social worker concluded: "[Father] was unaware of the circumstances that brought [K.P.] to the attention of this Agency and the fact that she tested positive for morphine at the time of removal. [Father] reported that the mother had not provided him the full story as to what was going on and led him to believe that [K.P.] had been cared for by [K.P.'s] maternal grandmother." The Agency recommended completing its assessment of father for consideration for K.P's placement with him.

At a special hearing held on December 5, 2013, the court made a finding that father did not have Native American heritage. Father testified he was present at the hospital when K.P. was born. Father stated that a home paternity test established his relationship to K.P., but he did not have the test results with him at the hearing. According to father, when K.P. was seven or eight months old, she started spending weekend days with father, but weekend nights with mother. Father said he and mother had a falling out, and the last time he saw K.P. was approximately a month and a half

4

before the hearing date. Father said he had paid mother child support of $400 monthly for six months. A few weeks before the hearing date, his employer had started garnishing his pay check for child support payments. The court ordered that Father have liberal supervised visits with K.P. The Agency offered voluntary services to father.

An Agency addendum report noted that mother still denied knowing of a way to contact father even after she knew father had contacted the Agency. The social worker concluded that "upon further research it is apparent that [mother] did have communication with [father]. [Her] [F]acebook reveals 'tagging' [father] in photos dating back to February 14, 2013, and as recent as September 13, 2013." The social worker added that father provided text messages from mother dating back to November 19, 2013, in which "[mother] informed [father] that [K.P.] was in Minnesota with the maternal grandmother. [Mother] continued on in her text to explain that [K.P.] would be back on December 12, 2013[,] and that [father] would be able to visit with the child then. [Mother] also asks for rental assistance from [father] for 'my mom and I.' " In light of the above, the social worker concluded: "[I]t appears that [mother] has not been forthcoming with this Agency regarding her interactions and the level of involvement with [father] preventing him the opportunity to perfect paternity prior to this juncture. [¶] On [November 12, 2013], [mother] was asked to move out of the apartment with her mother completely due to her relapse in the house and the desire to have [K.P.] placed in the home. However on November 29, 2013, she was asking [father] for assistance to pay the rent on the apartment she shares with her mother. [¶] [Mother] continues to display manipulative behaviors, which appear to satisfy her own needs and desires."

5

At the December 12, 2013 settlement hearing, Mother agreed K.P. could be placed with father as early as the following week. Father was recognized as K.P.'s presumed father.

In another addendum report, the social worker reported she spoke with the treating clinic and confirmed father was enrolled in the methadone program to withdraw from prescription medications, and not heroin. The social worker stated: "At this time it appears that the statements [father] had previously provided to this worker are accurate. [Father] appears concerned and willing to provide safe and appropriate care for [K.P.] at this time. Placement with [father] with support services to the family appears appropriate at this time."

On December 20, 2013, the court accepted the Agency's recommendation and adjudged K.P. a dependent of the county, and found by clear and convincing evidence that K.P. faced substantial danger to her physical health if she were returned to mother. Therefore, K.P. was removed from mother and placed with father. Mother was offered reunification services and supervised visitation with K.P.

At the six-month review hearing, father sought sole legal custody of K.P. At a pretrial status conference, mother sought joint legal custody and visitation.

At the July 31, 2014 trial regarding custody orders, mother was absent and the court denied mother's counsel's request for a continuance. The court granted the Agency's recommendation that father have legal, primary and physical custody of K.P, finding that mother came into the juvenile dependency system because of substance

6

abuse; she subsequently dropped out of treatment, individual therapy, and did not participate in co-parenting classes.

DISCUSSION

I.

Mother contends she provided the juvenile court sufficient information regarding her affiliation with the Winnebago Sioux tribe to invoke the ICWA notice requirement; therefore, the court erred by not providing notice.

"ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes and families by establishing certain minimum federal standards in juvenile dependency cases." (*In re Shane G.* (2008) 166 Cal.App.4th 1532, 1538 (*Shane G.*).) An Indian child is defined as any unmarried person who is under age 18 and is either (a) a member of an Indian tribe, or (b) eligible for membership in an Indian tribe and the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4).)

ICWA imposes a duty to give the child's tribe notice of the pending proceedings and provides the tribe a right to intervene "[w]hen a court 'knows or has reason to know that an Indian child is involved' in a juvenile dependency proceeding." (*Shane G.*, *supra*, 166 Cal.App.4th at p. 1538; § 224.2, subd. (a).) "Alternatively, if there is insufficient reason to believe a child is an Indian child, notice need not be given." (*Shane G.*, at p. 1538.) Notice requirements are meant to ensure that the child's Indian tribe will have the opportunity to intervene and assert its rights in the proceedings. (*In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1421.)

7

Section 224.3, subdivision (a) imposes an "affirmative and continuing duty" on the court and the Agency "to inquire whether a child for whom a petition . . . is to be, or has been, filed is or may be an Indian child in all dependency proceedings." Subdivision (b) states circumstances that may provide reason to know the child is a Native American child include the following: "(1) A person having an interest in the child . . . provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe. (2) The residence or domicile of the child, the child's parents, or Indian custodian is in a predominantly Indian community. (3) The child or the child's family has received services or benefits from a tribe or services that are available to Indians from tribes or the federal government, such as the Indian Health Service." (See also Cal. Rules of Court, rule 5.481(a)(5).)

If these or other circumstances indicate a child may be a Native American child, the social worker must further inquire regarding the child's status, including by interviewing the parents, extended family members or any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. (§ 224.3, subd. (c).) If the inquiry leads the social worker or the court to know or have reason to know a Native American child is involved, the social worker must provide notice to the tribe and the Bureau of Indian Affairs. (*Id.*, subd. (d); *Shane G.*, *supra*, 166 Cal.App.4th at pp. 1538-1539.) More than a bare suggestion of Native American ancestry is needed before notice is required. (*In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520.)

We conclude that proper inquiry was conducted to determine whether K.P. was a Native American child within the meaning of ICWA. The court questioned mother and her mother concerning the family's Native American heritage. According to these relatives, no family members had ever been registered or eligible for enrollment with a tribe and the court was not required to give notice. The evidence in this case is akin to that which this court found insufficient to invoke the notice requirement in *Shane G.*: "Here, Agency's inquiry produced no information Shane was an Indian child. The social worker interviewed the maternal grandmother who indicated Shane's great-great-great-grandmother was a Comanche princess. However, no one in the family ever lived on a reservation, attended an Indian school, participated in Indian ceremonies or received services from an Indian health clinic." (*Shane G*, *supra*, 166 Cal.App.4th at p. 1539.)

On this record, the court was not required to provide ICWA notice. (§ 224.3, subd. (d); *Shane G.*, *supra*, 166 Cal.App.4th at p. 1539 [an attenuated, speculative or vague claim of Indian heritage is insufficient to trigger notice requirements under ICWA].) "Where, as here, the record is devoid of any evidence a child is an Indian child, reversing the judgment terminating parental rights for the sole purpose of sending notice to the tribe would serve only to delay permanency for a child . . . rather than further the important goals of and ensure the procedural safeguards intended by ICWA." (*Shane G.,* at p. 1539.)

## II.

Mother claims the juvenile court erred by granting father sole legal custody of K.P. We disagree.

9

Under section 362.4, when the juvenile court terminates jurisdiction over a minor who has been adjudged a dependent, and proceedings for dissolution of marriage are pending in the superior court, the juvenile court, on its own motion, may issue an order determining the legal custody of the minor child. (See also *In re Chantal S.* (1996) 13 Cal.4th 196, 206 (*Chantal S.*).) A custody order under section 362.4 is commonly referred to as an "exit order." (See, e.g., *In re John W.* (1996) 41 Cal.App.4th 961, 970.)

Custody determinations in an exit order are committed to the sound discretion of the juvenile court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) " '[T]he juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child.' " (*Chantal S.*, *supra*, 13 Cal.4th at p. 206.) "[W]hen a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*Stephanie M.*, at p. 318.)

" 'Sole legal custody' means that one parent shall have the right and the responsibility to make the decisions relating to the health, education, and welfare of a child." (Fam. Code, § 3006.) " 'Joint legal custody' "means that both parents share the right and responsibility to make these decisions. (Fam. Code, § 3003.) To be workable, joint legal custody requires the parents' willingness to cooperate in making medical, educational, and psychological decisions. (See *In re Marriage of McLoren* (1988) 202 Cal.App.3d 108, 115-116 [observing, in most circumstances, children's best interests are

10

served by joint legal custody, but where there is acrimony "the reality of their parents' conflicts unavoidably hampers the realization of that goal"].)

Based on the evidence in the record and the juvenile court's factual findings, the court did not abuse its discretion by awarding father sole custody of K.P. The record contains substantial evidence that father provided mother with money to care for K.P., and he spent time with K.P. As soon as father became aware of K.P.'s placement in foster care, he took the necessary steps to restore his relationship with her. He was receptive to the Agency's suggestions for making sure he was a good parent, and the agency approved him and his fiancée for placement of K.P. The Agency considered that he took good care of K.P.

By contrast, the court's finding denying mother legal custody is supported by the record, and mother concedes that "[her] failure to make progress in her drug treatment and her self-reported April relapse may have precluded her physical custody." Mother merely protests that her situation was not as dire as that of the mother in a case the court cited, *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712-713. We need not discuss the facts of that case because father's counsel had cited to it in the juvenile court for the proposition that the court could properly grant father sole legal custody. Rather, under the deferential abuse of discretion test applicable to custody and visitation orders, the precise issue is whether the trial court could have reasonably concluded that the order in question advanced the "best interest" of the child. We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked.

11

We also conclude a proper basis for the court's grant of sole legal custody was the acrimony mother demonstrated toward father. (*In re Marriage of McLoren*, *supra*, 202 Cal.App.3d at pp. 115-116.) Mother did not disclose her contacts with father to the social worker, and maintained in the juvenile court that father should not be granted custody of K.P., in part because he lacked a relationship with K.P. However, mother herself denied him opportunities to see K.P. and hindered his ability to take care of his daughter by refusing to inform the Agency and the court of ways to contact him. Mother herself concedes "[her] only fault was in not volunteering advice as to how to reach father." Mother's damaging claim that father was getting methadone treatment for a heroin addiction was disproven by the clinic that stated he in fact was treated because he had been prescribed addictive medications. Mother also told the social worker that father did not support K.P. financially, when in fact he did.

In short, the record amply shows that the court did not abuse its discretion. Rather, it reasonably found that mother did not show sufficient ability to care for K.P. given mother's substance abuse difficulties, which endangered K.P., who tested positive for opiates. Further, the Agency had sufficient basis for concluding father was able to care for K.P. and the conflict between mother and father made joint legal custody inadvisable. Therefore, the court did not abuse its discretion because it reasonably concluded it was in K.P.'s best interest that father have sole legal custody.

DISPOSITION

The order is affirmed.

O'ROURKE, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.