Filed 3/16/16  In re M.J. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.J., a Person Coming Under the Juvenile Court Law. | B262323 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK01360) |
| Plaintiff and Respondent, | |
| v. | |
| ASHLEY J., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Teresa Sullivan, Judge.  Affirmed in part, reversed in part, and remanded.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

Ashley J., mother of five-year-old M.J., appeals from the juvenile court's exit order that granted sole legal and physical custody of the child to his father Charles M.[1] and required that mother's visits be supervised. (Welf. & Inst. Code, § 364.)[2] We hold that mother has failed to demonstrate that the court abused its discretion in terminating juvenile court jurisdiction. However, the court's exit order contains a factual error in that it appears to have given an incorrect reason for the court's order for supervised visits. Accordingly, we affirm the court's order under section 364 but remand the matter to the juvenile court to correct that portion of the exit order explaining why the court ordered supervised visitation for mother and M.J.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The events giving rise to the dependency jurisdiction*

When this case commenced, mother had three children from three different fathers, M.J., N.J. (aged 2), and Noah A. (aged 5 months). M.J., then three years old, was living with father.

M.J.'s half brother Noah was born in May 2013 with an underdeveloped heart and suffering from congenital syphilis and right facial palsy. The newborn remained in the hospital for seven weeks. The infant underwent two surgeries by August 2013, the first to install a band on his pulmonary artery, and the second to insert a G-tube for feeding.

In September 2013, Noah went into cardiac arrest and was placed on full life support. When he arrived at the hospital, he was severely dehydrated and suffered from " 'Acute, sever[e] malnutrition . . . that . . . is likely primarily non-illness related (behavioral vs. socioeconomic).' " The medical providers eventually agreed that the baby's problem was not organic, meaning that his heart condition did not contribute to his hospitalization. Rather, the malnutrition exacerbated other conditions in the baby. The infant was so emaciated that he had no muscle or fat. His bones were visible

---

[1]     Father is not a party to this appeal.

[2]     All further statutory references are to the Welfare and Institutions Code.

2

throughout his body and his skin was hanging in places. He also showed signs of neglect: he had bed sores and his G-tube was crusted from lack of use or proper cleaning. The dehydration prevented the baby from producing urine or blood for testing, and so the doctors tapped his spine.

The hospital staff found that the parents "presented poorly, showing little concern for the child, and focusing their attention on each other or their mobile devices." During the discussion of Noah's nutrition, mother appeared disinterested and kept checking her phone. The attending physician was unwilling to discharge the baby into his parents' care. Concerned that Noah's severe dehydration and malnutrition were not "medical in nature," and given the parents' history of missing medical appointments, the hospital staff alerted the Department of Children and Family Services (the Department) to possible child abuse.

The Department concluded that Noah was at "very high risk" for abuse. His condition was obvious to everyone and yet mother failed to provide a reasonable explanation why she did not bring him to the hospital sooner. The juvenile court ordered the children detained from mother in October 2013. M.J. remained with father.

M.J., who suffers from asthma and a heart murmur, has lived with his paternal grandmother most of his life. Mother and father have no formal, legal custody arrangement. Instead, mother, unable to care for M.J., gave him to the grandmother when he was a baby. Hence, mother has not been responsible for M.J. since his infancy and M.J. does not know his half siblings. Although father was M.J.'s custodian, the grandmother served his as primary caregiver because father, a truck driver, saw the child only on the weekends. Father claimed to have provided mother with some money for diapers and food even though he had custody of M.J. and he is not the father of the other children. He stopped giving mother money about two weeks before her children were detained.

There is no love lost between mother and father. Father described mother as dishonest. He explained that mother lied to the social worker about M.J.'s whereabouts and falsely reported that M.J. visited her. Father stated he had seen mother feed Noah a

3

couple of times and reported that Noah had no problems eating. Father's sister related that mother told her to hide M.J. from the Department. The grandmother reported that mother has never been a part of M.J.'s life and showed no interest in him. Mother reminded the Department of allegations from 2008 to 2009 that father had emotionally, physically, and sexually abused his two sisters and his daughter Platinum and son Malaki from another mother. Triggered by mother's report, the Department investigated and discovered that no case had been opened for father's sisters. As for Platinum and Malaki, the Department determined that the physical and sexual abuse allegations were unfounded, but Platinum was declared a dependent of the juvenile court in 2008 because of domestic violence between father and Platinum's mother. When that case was closed, father was given custody of Platinum. Mother has had no previous involvement with the juvenile court.

M.J. and his half siblings were declared dependents by the juvenile court in May 2014 (§ 300, subds. (b), (e) & (j)) after the court found true the allegations mother *willfully* failed to provide Noah with adequate food for a sustained period of time; failed to take the child to his scheduled medical appointments; and failed to maintain the child's hygiene. Father was not named in the petition and so he was non-offending. The court awarded mother monitored visits with M.J., twice weekly. As a case plan for mother and M.J., the court ordered mother to complete parenting classes, to submit to a psychological assessment (Evid. Code, § 730), to undergo individual counseling to address child safety, co-parenting, and all case issues, to attend all of Noah's medical appointments, and to follow all doctors' recommendations.

2. *Events occurring during the dependency*

Mother gave birth to her fourth child, Messiah A., in June 2014. The juvenile court did not detain Messiah from mother's care.

Mother completed a parenting course. She was defensive and initially resisted enrolling in counseling. She later claimed that she was in counseling but did not provide the Department with proof. Although mother received funding from the Department to

4

travel from her home in Lancaster to Children's Hospital in Los Angeles, she missed 8 of Noah's 13 medical visits between November 2013 and March 2014.

Mother underwent the court-ordered psychological assessment (Evid. Code, § 730) in July 2014. The psychologist found that mother "has an adequate understanding of basic parenting skills and infant care." She did not appear to have any "significant" clinical issues or cognitive dysfunction that would inhibit her parenting skills, create an unsafe environment for her children, or prevent her from providing for her children. However, based on her test scores, mother was distrustful of others, cynical about other people's true intentions, and may have difficulties with interpersonal relationships. Mother exhibited frustration about Noah's father and tensions between the two could create difficulties with parenting.

The Department found that Messiah was well cared for. However, after a safety assessment, the Department determined that M.J.'s half sister N.J. was at moderate risk of harm if returned to mother's care without family preservation services. The child's return to mother was also premature because mother's visits had not been liberalized.

Meanwhile, the social worker observed that father and the grandmother were taking good care of M.J. and that father and son shared a "very strong attachment." As no safety concerns existed for M.J. in father's care, the Department recommended termination of jurisdiction over that child.

Mother requested that her visits with M.J. be liberalized. At a November 17, 2014 hearing, the juvenile court denied mother's request because the Department had been ordered to facilitate visits. The court ordered the Department to provide it with a supplemental report describing mother's visits with M.J. and the Department's efforts to facilitate visitation.

The ensuing reports and Departmental logs revealed that father was resistant to transporting M.J. to visit mother. Father worked 12-hour days and lived in Riverside County, far from mother. He did not have a car and, although a family member could transport M.J. for visits, she refused to do so because of the way mother behaved toward her. Father was also frustrated because mother had spitefully raised old allegations of

abuse and had otherwise done nothing for the child from the time he was born. In October 2014, the social worker had begun a search for a Departmental employee to transport M.J. to visits and told father that in the interim, he was obligated to help with transportation. The record contains undated letters to mother and father establishing a weekly visitation schedule. Despite difficulties in scheduling visits, the Department recommended, should the juvenile court terminate jurisdiction, that any family law order include monitored visits.

In December 2014, the social worker found a Departmental monitor who agreed to conduct visits on the weekends. The visits went well. M.J. was excited to see mother and stated he liked visiting her. Mother was appropriate with the child. The monitor canceled one visit. Generally, mother had twice monthly visits with M.J. between October 2013 and April 2014. As of April 2014, the visits were occurring weekly.

3. *The six-month mark*

At the hearing for M.J.'s half siblings (§ 366.21, subd. (e)), the juvenile court declined to return Noah to mother's custody after finding that return would put the baby at substantial risk of detriment, although the court did order N.J. returned to mother's custody.

At the section 364 hearing for M.J., held on February 3, 2015, father testified that he had concerns about his son's safety in mother's custody because of what he termed her "lack of judgment." As examples, father cited that mother dredged up Platinum's closed case; and threatened father. Also, M.J. "act[ed] funny" when he returned from visits with mother, for example, he reported that mother told him he did not have to eat. Father also testified that mother discussed case issues with M.J. in violation of court orders. The last time M.J. returned from a visit with mother, he announced that mother informed the child that he did not have to listen to father because he did not have to worry about returning to father's house any more. M.J. had lived with father since the child was three months old. Father and mother never made a formal visitation arrangement because, historically if mother called, it was to ask for money, not to see M.J. Father claimed he only canceled

one visit, and the reason was that M.J. was sick. By contrast, father testified that mother canceled four visits.

Mother testified in rebuttal that she had a total of five visits between October 2013 and the hearing, three of which occurred in the last six months. Mother claimed she called and e-mailed the social worker to request visits with M.J. once a week. Mother testified that the social worker replied that father believed mother did not deserve visits.

At the close of testimony, mother requested that the parents share joint legal custody. So as not to "uproot" M.J., mother agreed to an order granting father physical custody and mother unmonitored, alternating weekend visitation. Mother also asked that M.J.'s case remain open to ensure that her visits took place. Father noted that he is nonoffending, has been cooperative, has always provided for M.J., and the two were very closely bonded. Father also expressed concerns about mother's judgment, and noted that mother had unresolved feelings about father causing father to worry that mother would talk negatively about him to M.J. M.J.'s attorney requested joint legal custody and unmonitored visits for mother who had complied with her case plan and had custody of two of her children under a plan of family preservation. The Department recommended that the case be closed with an exit order giving father legal and physical custody and mother monitored visits.

The juvenile court found that the conditions that justified jurisdiction over M.J. no longer existed and were not likely to arise if supervision were withdrawn. (§ 364, subd. (c).) Accordingly, the court terminated jurisdiction with a family law order granting legal and physical custody to father with monitored visits for mother. The court ordered each party to meet half way. Mother's appeal followed.[3]

---

[3]  We grant mother's request to deem her appeal as prematurely taken from the juvenile court's oral exit orders and to augment the record to include the February 11, 2015 custody and visitation order.

CONTENTIONS

Mother contends that the section 364 order awarding sole legal and physical custody to father and restricting mother's visits to supervised was not in M.J.'s best interest and hence an abuse of discretion.[4]

DISCUSSION

When the juvenile court terminates jurisdiction in a dependency case, it may issue an order for custody and visitation. (§ 362.4; *In re Chantal S.* (1996) 13 Cal.4th 196, 202-203.) This so-called "exit order" is transferred to the family court (§ 362.4; *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712, citing *In re Roger S.* (1992) 4 Cal.App.4th 25, 30) and remains in effect until modified or terminated by the family law court. (*In re John W.* (1996) 41 Cal.App.4th 961, 970.)

The juvenile court's focus when fashioning exit orders is on the best interests of the child. (See *In re Chantal S.*, *supra*, 13 Cal.4th at p. 206.) The court has broad discretion to determine what best serves a child's interests and such decision will not be reversed absent a clear abuse of discretion. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1227-1228.) An abuse of discretion occurs when the court " ' " 'mak[es]an arbitrary, capricious, or patently absurd determination [citations].' " ' [Citations.]" (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300-301.)

The record here shows that the exit orders were not an abuse of discretion. M.J. had been in father's care since he was three months old. The two were closely bonded. Father, who was nonoffending, provided the child with good care and the child was happy and healthy. In contrast, mother was M.J.'s primary caretaker for only the first 3 months of his life. Mother's assertion - supported by citation only to her attorney's argument - that she "had joint custody with father before the dependency case started" mischaracterizes the events. While the parents did not have a formal legal custody

---

[4] M.J. was not removed from his mother's physical custody because he was not in mother's custody at the time the petition was filed with the result section 364 governs this case. (§§ 364, subd. (a) & 361, subd. (c); *In re Natasha A.* (1996) 42 Cal.App.4th 28, 35.)

8

arrangement, mother chose to abandon M.J. to his grandmother when the boy was an infant and since then had almost no contact with him until this dependency. M.J. did not really know his half siblings until court-ordered visitation. Moreover, it was mother's conduct that brought the family into the dependency system. It is insufficient that mother was in substantial compliance with her case plan at the six-month mark, mother's argument to the contrary notwithstanding. Noah could not yet be safely returned to mother and N.J. still required family maintenance services. Moreover, the record reveals that mother lied to father and the social workers and was difficult to work with. Mother's psychological assessment indicated her mistrust and cynicism about others, and her frustration and tension with Noah's father that could create parenting difficulties. For these reasons, the juvenile court's determination that it was in M.J.'s best interest for father to have full physical and legal custody of the child to make decisions independently about the child was neither arbitrary, nor capricious, nor absurd.

Mother contends there was no evidence that she ever harmed M.J. or posed a risk of harm to him. While true, the assertion is irrelevant. On this record, the juvenile court could easily conclude that mother had no opportunity to harm M.J. because the child was not living with mother and, according to father, had had no contact with mother until court-ordered visitation, which has always been monitored.[5] More important, "both parents are [not] equally entitled to half custody" in dependency exit orders. (*In re John W.*, *supra*, 41 Cal.App.4th at p. 974, italics added.) When the juvenile court hears a dependency case under section 300, it is handling children who have been abused, abandoned, or neglected and so it stands as parens patriae, having a special responsibility to those children and considers the totality of a child's circumstances when making decisions regarding the children. (*In re Chantal S.*, *supra*, 13 Cal.4th at p. 201, citing *In re Roger S.*, *supra*, 4 Cal.App.4th at pp. 30-31.) Thus, " '[t]he presumption of parental fitness that underlies custody law in the family court . . . does not apply to dependency

---

[5]     Mother's lack of contact with M.J. also renders immaterial her assertion that the exit orders ignored her "past care of [M.J.]."

9

cases' decided in the juvenile court. [Citation.]" (*In re Chantal S.*, *supra*, at p. 201.) The Family Code's "presumption that joint custody is in the best interest of the minor is inconsistent with the purposes of the juvenile court." (*In re Jennifer R.*, *supra*, 14 Cal.App.4th at p. 712, fn. omitted.) Under the totality of the circumstances here, the juvenile court did not abuse its discretion in determining that it was in M.J.'s best interest for father to have full legal and physical custody.

As for the visitation portion of the exit order, mother contends that the juvenile court abused its discretion by requiring that mother's contact be supervised. Noting that M.J. enjoyed visits with mother and wanted more, mother argues that the visitation restriction curtails her relationship with M.J.

A juvenile court may reasonably determine that continued supervision of the child as a dependent is no longer necessary for the child's protection, but at the same time determine that conditions on visitation are necessary to minimize, if not eliminate, the danger that visits might subject the minor to the same risk of physical abuse or emotional harm that previously led to the dependency adjudication. (*In re Chantal S.*, *supra*, 13 Cal.4th at p. 204.) Here, in fashioning its exit orders, the juvenile court implicitly concluded that dependency was no longer necessary, provided mother's visitation was supervised. In *In re Chantal*, the Supreme Court approved a similar conclusion on the ground it was preferable to forcing the child to remain indefinitely in the juvenile court dependency system while the parent attempted to resolve his problems. (*Ibid.*) This case presents an analogous situation. The juvenile court found that father was taking good care of M.J. who was happy under father's care. Mother was making progress but had yet to merit the closure of her children's dependencies and had never had unmonitored visits with M.J. Also, the juvenile court heard that mother was attempting to undermine father's relationship with M.J. Father testified about the effect mother's comments had on M.J., and the fact that she inappropriately discussed court issues with the child. The court could reasonably conclude that if mother were allowed unmonitored visitation, this sabotage, which was detrimental to M.J., would continue.

Mother also argues that the visitation portion of the exit order made visits unnecessarily onerous. The record shows that the Department had difficulty scheduling visitation. Also, mother requested that the juvenile court not terminate its jurisdiction to make sure that visits occur. By imposing specific requirements for visitation, including supervision, the court ensured that the visits would occur.

Finally, mother observes that the portion of the exit order that explains why the juvenile court ordered that mother's visits with M.J. be supervised is incorrect. The stated reason was that mother had not made substantial progress in her case plan. However, mother and the Department agree that in fact the juvenile court found that mother had made "substantial" progress toward alleviating the causes for the dependency. Accordingly, the matter must be remanded to the juvenile court to correct this portion of the exit order.

In the final analysis, mother's parental rights to M.J. were not terminated here. Instead, the juvenile court merely terminated its jurisdiction with a family law exit order (§ 364). That order may always be modified or terminated. (*In re A.C.* (2011) 197 Cal.App.4th 796, 799.)

DISPOSITION

The order under Welfare and Institutions Code section 364 is affirmed.  The portion of the exit order explaining the reasons for mother's supervised visitation with the child M.J. is reversed and the matter is remanded to the juvenile court to correct this portion of the exit order only.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.



We concur:



EDMON, P. J.



LAVIN, J.


12