Filed 5/20/21  In re D.L. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| In re D. L., a Person Coming Under the Juvenile Court Law. | B307147 |
| | (Los Angeles County Super. Ct. Nos. 19CCJP03178, 19CCJP03178A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| PATRICIA F., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Brett Bianco, Judge.  Affirmed

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Rodrigo A. Castro-Silva, County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Appellant Patricia F. (mother) challenges a juvenile court order awarding sole legal custody to child D.'s father upon termination of juvenile court jurisdiction. The juvenile court case was initiated after mother and newborn M. tested positive for amphetamine and methamphetamine at the time of M.'s birth in April 2019. The juvenile court exercised jurisdiction pursuant to Welfare and Institutions Code section 300[1] over M., three-year-old P., and seven-year-old D. on the basis of mother's drug abuse and mother's history of domestic violence with her boyfriend, M. and P.'s father. The court found that D.'s father, who shared custody of D., was non-offending.

The court did not detain the children from mother, and mother initially complied with the case plan, which included drug testing and a drug abuse treatment program. However, on April 29, 2020, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition under section 387 after mother stopped drug testing and participating in services. The children were detained, D. was placed with father, and the court sustained the section 387 petition. Mother did not resume services under the case plan, and when the court terminated jurisdiction over D. in August 2020, it awarded sole physical and sole legal custody to father, with monitored visitation for mother.

---

[1]All further statutory references are to the Welfare and Institutions Code.

Mother now challenges only the court's award of legal custody. We find no error and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *Detention*

D. and his half-siblings came to the attention of DCFS in April 2019, when M. tested positive for amphetamine and methamphetamine at birth. At the time, D. was seven years old and lived part-time with mother in her parents' (maternal grandparents') home. Also living in the home were D.'s three-year-old half-sister P.; P. and M.'s father, Joseph; a maternal aunt; and maternal great-grandfather. Mother and father shared custody of D., so D. lived with father several days per week.

A children's social worker (CSW) visited mother's home on April 26, 2019, and found the home clean and well-furnished. Mother denied any domestic violence between her and Joseph, but Joseph admitted that he had been charged for a domestic violence incident involving mother in 2014. The maternal aunt living in the home told the CSW that she was in the process of getting a restraining order against Joseph. Mother said that if maternal aunt got a restraining order, mother would remain in the home and Joseph would move out. The CSW observed the children, who appeared clean, well-fed, and appropriately dressed.

Mother said she did not use drugs "that much," but the CSW noted that mother had sores and scabs suggesting regular methamphetamine use. Mother agreed to submit to drug tests and enroll in an outpatient drug treatment program. Joseph declined to submit to drug tests. Father told the CSW that he suspected mother was on drugs, but he could not prove it.

3

DCFS did not immediately detain the children. The CSW visited the home again on May 8, 2019. Mother had not yet enrolled in the outpatient drug program, but she had tested negative twice. Later that day, mother initiated the process to be assessed for the outpatient drug treatment program. DCFS noted that mother was "very cooperative" and had "a strong support system in the home of the maternal grandparents and aunt." DCFS stated in the detention report that it wanted to "pursue the least restrictive route for this family in filing a petition with the Court for Court ordered Family Maintenance services." DCFS recommended that the children be detained in maternal grandparents' home, with monitored visitation for mother and Joseph.

On May 20, 2019, DCFS filed a juvenile dependency petition under section 300, subdivision (b)(1). Count b-1 alleged that M. tested positive at birth for amphetamine and methamphetamine, and that "mother's substance abuse and [Joseph's] failure to protect [M.] endangers the child's physical health and safety." Count b-2 alleged that mother "has a history of substance abuse and is a current user of amphetamine and methamphetamine which renders the mother incapable of providing [M., P., and D.] with regular care and supervision." Count b-2 further alleged that Joseph "knew or reasonably should have known that the mother was abusing illicit drugs and [Joseph] failed to protect" the children. Count b-3 alleged that Joseph was a user of marijuana, which rendered him incapable of caring for P. and M.

On May 21, 2019, DCFS filed a last-minute information stating that Joseph had voluntarily moved out of maternal grandparents' home. When Joseph went to maternal

4

grandparents' house to see the children, he and mother got into a verbal altercation. Joseph picked up three-year-old P., put her in the back seat of his car without a car seat, and attempted to drive away. Mother tried to stop him by pulling the keys from the ignition, but Joseph drove away, dragging mother about 10 feet before she fell to the ground. The family called 911, and law enforcement told mother that Joseph would be arrested for domestic violence. Mother also said she would seek a restraining order against Joseph.

At the detention hearing on May 21, 2019, the court noted that father was non-offending. The court found that there were "reasonable services available to prevent detention," and ordered D. released to mother and father. The court also released P. and M. to mother, detained P. and M. from Joseph, and entered a no-contact order for D. and Joseph. The court warned mother that if she tested positive for drugs, the children would be detained from her. The court ordered DCFS to work with mother and father to work out a schedule for D.'s custody.

B.    *Jurisdiction and disposition*

On July 1, 2019, DCFS filed an amended petition under section 300, subdivision (b)(1). The first two counts remained the same. Count b-3 relating to P. and M. was revised to allege that Joseph had a substance abuse history and that he was a current user of marijuana and methamphetamine. DCFS also added count b-4, alleging that mother and Joseph had a history of domestic violence, including a 2014 incident in which Joseph was arrested for domestic violence, an incident in which Joseph punched mother in the face when she was pregnant with P., and the recent incident in which Joseph drove away with P. in the car. Count b-4 alleged that Joseph's violent conduct and mother's

5

failure to protect the children, including allowing Joseph access to the children, placed the children at risk of harm.

A jurisdiction/disposition report dated July 23, 2019 stated that D. was living with mother and doing well. D. told the DCFS investigator that he had not witnessed mother or Joseph doing drugs or fighting, but he said that mother and Joseph sometimes argue. D. was in second grade and doing well in school. P. and M. also appeared to be doing well.

Mother admitted to "smoking meth" the day before she gave birth to M., and to using methamphetamine throughout the pregnancy. Mother said that she did not use methamphetamine while watching the children, because maternal grandparents cared for the children while she was using. Mother enrolled in an outpatient drug treatment program in June 2019, and she had several negative drug tests and one no-show. Mother also admitted the domestic violence history with Joseph, but stated that D. did not witness the altercations. Mother also stated that the incident involving Joseph driving away with P. in the car "wasn't something big," and the report of the incident was exaggerated. Mother admitted that she had been arrested for prostitution when she was 18 years old, after she and Joseph had "come up with a plan to make more money by prostituting." Mother and Joseph were still together and intended to continue their relationship.

Mother stated that she and father met in high school, and mother got pregnant with D. shortly thereafter. Mother and father separated when D. was about one year old, and they had co-parented D. since then with no issues.

Joseph denied the allegations, said he knew nothing about mother's drug use, and stated that he uses marijuana. Regarding

6

the domestic violence incident involving P., Joseph said that mother assaulted him when he took P. for a visit. Joseph stated that he and mother have a good relationship as long as maternal family does not "get involved." Joseph told the DCFS investigator that he was not interested in participating in services.

In a last-minute information, DCFS included information from an interview with father. Father worked full time for a gas distribution company, and typically had D. in his care from Friday night to Monday morning. Father said he wanted full custody of D., because he felt D. would be safer in his care. Father had suspected in the past that mother was using drugs and he tried to get a sole custody order, but the court denied his request because he did not have sufficient proof. D. told father that mother and Joseph were visiting with each other outside maternal grandparents' house, where D. could see them through the window. Father stated that he did not want Joseph to have access to D., because father believed Joseph was a drug user, and because of Joseph's past aggressive behavior.

DCFS found the family to present a high risk of future abuse or neglect. DCFS recommended that D. remain released to mother and father, and that mother be provided with family maintenance services.

At the adjudication and disposition hearing on August 20, 2019, mother pled no contest to the first amended petition, as further amended by interlineation. Count b-2, as sustained, stated that mother has an unresolved history of substance abuse and is a recent user of amphetamine and methamphetamine, and that mother's drug abuse placed the children at risk of harm. Count b-4, regarding mother and Joseph's history of domestic

7

violence, was sustained without further amendment. The court dismissed counts b-1 and b-3. The court found father to be non-offending. The court therefore found D. to be a person described by section 300, subdivision (b)(1), and placed him in the home of parents under DCFS supervision. As to P. and M., the court released the children to mother and provided visitation for Joseph, acknowledging that Joseph no longer lived in the maternal family's home.

A status review report dated February 18, 2020 stated that father and mother continued to share custody of D. Father and mother had stipulated to a 50-50 custody arrangement, and D. told the social worker that he enjoyed spending time at both homes. The status review report stated that father and mother "communicate regularly and work together to ensure [D.] is getting the care and support that he needs." D. was doing well in school, but his attendance record showed "excessive tardiness and unverified absences." D. was in therapy for anxiety, and was making progress toward his treatment goals.

Mother was in partial compliance with her case plan. She consistently attended parenting classes, she was participating in an outpatient drug treatment program, and she told the CSW that she was confident in her sobriety. Mother was employed and taking classes online. However, the status review report noted that mother missed a drug test on December 24, 2019, and had "7 declined drug tests during mother's drug program (although mother has completed the drug program)." DCFS found that mother was in partial compliance with court orders regarding drug treatment and testing, and in compliance with the other aspects of the court's orders. The CSW had to contact mother on maternal grandmother's phone, because mother's phone had been

disconnected. Joseph was staying with his parents, did not have a working phone number, and refused to make himself available to the CSW. DCFS found that the risk of abuse or neglect remained high, and recommended that family maintenance services be continued.

A last-minute information stated that Joseph had been arrested on February 2, 2020 for possession of a substance that appeared to be methamphetamine. DCFS requested that family reunification services be terminated for Joseph. At the review hearing on February 18, 2020, the court held that continued jurisdiction was warranted, and ordered the parents to continue participating in all previously ordered services.

C.    *Section 387 petition*

On April 29, 2020, DCFS filed a petition under section 387 alleging that mother failed to drug test eight times from February 18 to April 20, 2020, and that she was discharged from her domestic violence prevention program on March 1, 2020 due to lack of attendance. The petition also stated that although Joseph's visits with P. and M. were required to be monitored, mother and Joseph were together with the children without an approved monitor.

A detention report filed April 29, 2020 stated that on April 27, D. was detained from mother and placed with father. In March 2020, DCFS received a report that mother was in possession of drug paraphernalia. Mother denied that she was using drugs again, but the CSW observed that mother had not been drug testing and she had marks on her face suggesting drug use. The maternal aunt reported to the CSW that she learned that mother had been fired from her job. On April 14, 2020, mother took the children from maternal grandparents' home and

9

left with Joseph because she was angry at maternal grandparents. Mother still did not have a phone; maternal grandparents reported that Joseph broke mother's phone. After mother took the children from maternal grandparents' home, maternal grandparents went to Joseph's parents' home to look for mother and the children; while maternal grandparents were there, Joseph threatened to kill them. Maternal grandparents called police, but they did not do anything. The CSW confirmed reports that mother stayed at a hotel on the night of April 15, but it was unclear whether mother had the children with her at the time.

When the CSW spoke with mother the following day, mother explained that she stayed at a hotel to avoid telling maternal grandparents that she lost her job. Mother said she did not know why she lost her job. Regarding maternal grandparents going to Joseph's house, the detention report stated, "Mother states [Joseph] threaten[ed] to kill [maternal grandparents] because she thinks [maternal grandmother] grabbed him or touched him. The children were asleep during the interaction. The mother failed to demonstrate insight into the safety and risk factors this could pose to the children's well-being." The report noted that mother "appears very fixated on maintaining the relationship" with Joseph. Mother told the CSW she did not know she was supposed to be drug testing. DCFS stated that mother's "continued possible use[ ] of controlled substances and her inability to end contact" with Joseph posed a risk to the children. It also noted that although mother had completed part of her drug treatment program, she failed to complete the after-care drug program, and "[i]t does not appear that mother's

10

progress partial compliance [*sic*] can resolve the current safety concerns."

At a hearing on the section 387 petition on May 4, 2020, the court noted that mother admitted most of the allegations in the petition, and held that detaining the children was appropriate. The court ordered that mother's visitation be monitored.

D.    *Termination of jurisdiction*

A jurisdiction/disposition report dated August 3, 2020 stated that D. remained living with father. Father reported that D.'s anxiety had decreased and he was doing well. Mother had had not drug tested in May or June, and there was no later information about drug tests in the record; mother said she was not using drugs. In July 2020, mother again told the social worker that she did not know that she was supposed to continue drug testing, and blamed the former social worker for not doing her job. Mother told the CSW, "I have shown that I can test negative and do my services. Now, I have no resources whatsoever from that social worker. I was kicked out during a pandemic and had nowhere to go and tested positive for Coronavirus. I did not have a place to go and sometimes I stay with Joseph; this is very stressful and I have no help whatsoever." Joseph had been arrested in May 2020 for felon in possession of a firearm and possession of a controlled substance.

DCFS recommended that the section 387 petition be sustained. It further stated, "At this time DCFS does not have any concerns for [father] and the child, [D.]," and recommended that jurisdiction be terminated with a family law order giving father sole physical and sole legal custody, and providing mother with monitored visitation.

A status review report dated August 17, 2020 stated that D. remained with father and was doing "very well." Father maintained a relationship with maternal grandparents, who were caring for P. and M., and the children had sibling visits. The report noted that "during this review period, the mother's relationships with her family members has become increasingly fraught, as drug paraphernalia belonging to the mother was found in the home and the mother resumed her romantic relationship with [Joseph]. The mother also lost her employment." Mother had not resumed drug testing or any other programs, and DCFS noted that although mother "could articulate things she was learning in classes, she is unable to apply this to her own situation." DCFS again asked that the section 387 petition be sustained.

At the adjudication hearing on August 3, 2020, the court sustained the section 387 petition, and found that the previous disposition had been ineffective in ensuring the protection of the children. Counsel for DCFS and the children requested that the court terminate jurisdiction over D., with physical and legal custody to father and monitored visitation for mother. Mother's counsel opposed the termination of jurisdiction, stating that mother wanted further opportunities to reunify with D. Mother asked for joint legal custody if the court were inclined to terminate jurisdiction, asserting that there was "no indication that mother would be unable or would make it difficult to make a decision for the child's well-being." Father's counsel asked the court to terminate jurisdiction with sole physical and sole legal custody to father, stating, "It would be impossible for [father] to work with the mother on this case regarding legal issues such as educational, medical decisions. He would not be able to make it

12

work based on her history and lack of compliance in the case plan."

The court terminated jurisdiction over D.  It ordered physical and legal custody to father, with monitored visitation for mother.  The court requested that a family law order be prepared, and stated, "The rider should reflect those components of mother's case plan which she needs to complete before she may have unmonitored visitation" with D.  The court's exit order, filed August 7, 2020, awarded father "sole legal custody, sole physical custody, with monitored visitation for the mother, 3 times a week for 3 hours each visit."  Mother timely appealed.

## DISCUSSION

On appeal, mother challenges only the court's award of sole legal custody to father.  DCFS asserts that the custody order was appropriate.  "When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court."  (*In re Roger S.* (1992) 4 Cal.App.4th 25, 30.)  We review a "juvenile court's decision to terminate dependency jurisdiction and to issue a custody (or 'exit') order pursuant to section 362.4 for abuse of discretion."  (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

Legal custody involves "the right and the responsibility to make the decisions relating to the health, education, and welfare of a child."  (Fam. Code, § 3006.)  "When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child."  (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.)  Thus, "the court's power under section 362.4 require[s] it to make

13

an informed decision concerning the best interests of the child." (*In re John W.* (1996) 41 Cal.App.4th 961, 972.)

Mother asserts that "DCFS did not present any evidence to support its recommendation that Father be granted sole custody." She also argues that father "never reported that he had difficulty communicating with Mother or that they were unable to work together to make decisions about" D. DCFS asserts that the trial court did not abuse its discretion, because the evidence showed that mother failed to comply with her court-ordered case plan and D. was thriving in father's care.

We find no abuse of discretion. The evidence supports a finding that the best interests of D. were served by placing legal custody with father, the non-offending parent who was providing D. a safe and stable home. DCFS's reports throughout the case stated that D. was thriving in father's care. By contrast, mother's actions were not conducive to the well-being of the children. She used drugs while pregnant with M. and maintained a relationship with Joseph despite their violent history, which included a physical altercation involving P. while the case was pending. Although the children were not initially detained from mother, her continued failure to comply with court-ordered programs led to their detention a year after the case was initiated. Toward the end of the case, mother was not employed, she did not have a phone, all three children had been removed from her care, and it was unclear where she was living. Mother remained in a relationship with Joseph, who was arrested twice on drug possession charges (plus a weapons charge) while the case was pending. When asked about her failure to complete court-ordered programs, mother blamed the social worker and other factors instead of taking responsibility for the issues that

14

led to the juvenile court's exercise of jurisdiction. The juvenile court held that mother's visitation with the children should be monitored, a finding that mother does not challenge. The evidence supported the court's finding that it would be in D.'s best interest to place legal custody with father, who demonstrated consistency and stability in providing for D.'s needs.

Mother contends this case is dissimilar to *In re Jennifer R.* (1993) 14 Cal.App.4th 704 (*Jennifer R.*), in which the mother, Shannon, challenged the lower court's award of legal custody over the child, Jennifer, to the father. The Court of Appeal affirmed the custody order, noting that Shannon "did not follow through on drug rehabilitation referrals and failed to drug test while assuring her therapist she was drug free and had completed rehabilitation. She was irregular in her visitation with Jennifer and angry about restrictions upon the conduct of those visits. There were reports of Shannon acting inappropriately with Jennifer during visitation. Shannon had an extensive history of serious mental illness. [¶] The report by her own expert showed she had significant emotional disturbances and developmental and learning disabilities. Dr. Schramm's report indicated Shannon's ability to anticipate the consequences of her behavior and her ability to form general concepts when faced with new leaning situations was impaired. He also reported Shannon withdrew from and did not get along with others and further reported she may be impulsive, maladjusted, and emotionally unstable. While Dr. Schramm recommended increased and unsupervised visitation, his report viewed as a whole does not support Shannon's claim she is capable of sharing legal custody but rather supports the court's determination such participation

15

would not be in Jennifer's best interests. Shannon's inability throughout these proceedings to care for herself and her children, her failure to make progress in overcoming the problems leading to Jennifer's removal, her inconsistency and inappropriateness in visitation, as well as Dr. Schramm's report amply support the court's decision Shannon's participation in making important decisions relating to Jennifer's welfare would not be in the child's best interests." (*Id*. at p. 713.)

Mother asserts that this case is distinguishable. Although mother admits that she "stopped complying with her service plan," she argues that the facts here were not as severe as those in *Jennifer R.*, and the evidence showed that she was appropriate in her visits with D. We agree that the facts in *Jennifer R.* are distinguishable, but there are also many similarities: mother failed to comply with her case plan, she failed to drug test while insisting that she was not abusing drugs, and she failed to show insight into the issues leading to juvenile court jurisdiction despite having her children removed from her care. Moreover, nothing in *Jennifer R.* suggests that it delineates the limits upon which a court may find that legal custody with one parent is in the child's best interests.

Mother argues that the evidence showed that placing sole legal custody with father was *against* D.'s best interests, because for most of D.'s life mother and father had worked together to ensure D.'s needs were met. Mother points to portions of the record noting that mother and father had successfully co-parented D. before the juvenile court case began. She argues that there was no evidence showing that mother's issues "prevented her from being able to work with Father to make . . . necessary decisions about [D.'s] upbringing."

16

The court's focus, however, was D.'s best interest—not mother's ability to work with father. The court was not required to rely on the parents' history of co-parenting in determining D.'s best interests. Moreover, the evidence showed that the parents' history was not without difficulty. Father told a social worker that he suspected mother was abusing drugs as early as 2017, before the juvenile court case began and while mother and father were co-parenting D., but father was unable to get a family court custody order due to lack of proof. While the juvenile court case was pending, mother did not have a phone and the record indicates that the social workers had difficulty contacting mother. Mother violated court orders regarding having the children with Joseph and she failed to comply with her case plan, even after the children had been removed from her care. It was reasonable for the court to conclude that it was in D.'s best interest to have father alone make important educational and medical decisions for D.

Mother also asserts that D. told social workers he liked having both mother and father involved in his life. Indeed, the record makes clear that D. was well-bonded with mother, his siblings, and mother's other family members. However, "although a child's wishes may be evidence of what is in his best interest, they cannot be dispositive." (*In re Jacob P.* (2007) 157 Cal.App.4th 819, 832.) The evidence supports the court's finding here, and we cannot substitute a different decision for that of the juvenile court. (See, e.g., *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 ["'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the

17

reviewing court has no authority to substitute its decision for that of the trial court.'"].)

We therefore find that the trial court's award of sole legal custody to father was not an abuse of discretion. Nothing in this opinion forecloses any future finding that joint legal custody would be in D.'s best interests, should circumstances warrant.

## DISPOSITION

The juvenile court's custody order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

WILLHITE, ACTING P.J.

CURREY, J.

18