14 Cal.App.4th 704 (1993)
17 Cal. Rptr.2d 759
In re JENNIFER R., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
SHANNON M., Defendant and Appellant.
Docket No. D017746.
Court of Appeals of California, Fourth District, Division One.
March 10, 1993.
*706 COUNSEL
Denise Moreno Ducheny, under appointment by the Court of Appeal, for Defendant and Appellant.
Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, and Terri L. Richardson, Deputy County Counsel, for Plaintiff and Respondent.
Robert Wayne Gehring as Amicus Curiae, upon the request of the Court of Appeal, on behalf of Minor.
OPINION
KREMER, P.J.
Shannon M., also known as Shannon R., (Shannon or the mother) appeals from an order of the juvenile court granting sole legal custody of her daughter Jennifer to Jennifer's father, Michael R. (Michael or the father). Because we find the court's order was in the best interest of the minor and supported by substantial evidence, we affirm.

BACKGROUND
In September 1990 the San Diego County Department of Social Services (the Department) filed a dependency petition on behalf of one-year-old Jennifer alleging she was a person described by Welfare and Institutions Code[1] section 300, subdivision (b). The petition alleged that Shannon was unable to provide regular care for Jennifer due to substance abuse and that Jennifer's physical safety was endangered due to the parents' domestic violence. It also alleged the parents had failed to properly supervise and attend to Jennifer by failing to maintain a safe and sanitary residence, administering nonprescription drugs for sedative purposes and failing to provide adequate care for extensive heat and diaper rash.
The petition resulted from observations of the trailer where the family resided. A police officer had responded to a request to check on Jennifer's welfare. He found the trailer "extremely hot" with the windows closed. The *707 thermostat read 100 degrees Fahrenheit. The entire trailer was filthy with dirty clothes and roaches. The kitchen was full of dirty dishes and pans, and had knives lying around. The bedroom was filthy with the mattress and pillows "nearly black." The bathroom was dirty with the tub half filled with water. Jennifer was in her crib sweating profusely. Her diapers emitted a bad odor and the sheets were "outrageously dirty." Ants were crawling on her legs. Michael, who was in the trailer, blamed the conditions on Shannon saying there were times he wanted to set the place on fire. The officer removed Jennifer to Hillcrest Receiving Home. There a nurse found Jennifer had a bad heat rash throughout her body and a diaper rash that had turned to blisters.
During the Department's investigation, the trailer park manager informed the social worker he had driven Shannon to the store where she purchased over-the-counter medication. Shannon told the manager it was to make the baby quiet so Shannon could leave her unattended while she went "visiting." The medication was not for any illness. Another witness reported that when she asked Shannon why she never heard the baby cry, Shannon responded she "put Benadryl in the baby's bottle" and that it "works real good."
Other witnesses reported that Shannon used methamphetamine and heroin and that Michael beat Shannon. The social worker observed track marks on Shannon's arm. It was determined that Shannon had a history of mental illness including severe depression and schizophrenia. Michael had become physically disabled when he broke his neck one year before.
Shannon had two other children previously removed from her custody in Arkansas who remained in court-ordered placement. The children had been removed for neglect and in the case of a nine-month-old son for giving him intravenous drugs for sedative purposes. Shannon had suffered a criminal conviction in relation to the administration of drugs to her son leaving him in a serious medical condition.
In July 1989 Michael and Shannon had been provided with a voluntary contract for dependency diversion services after the Department had received a referral for their domestic violence and general neglect of Jennifer. Neither had complied with the contract.
The parents eventually submitted on the Department's report. The court removed physical custody from the parents and ordered them to comply with a reunification plan.
At the time of the six-month review hearing in April 1991, Shannon was pregnant and had gone to Arkansas to stay with her mother. Shannon and *708 Michael had fought, with Michael claiming Shannon had been using drugs and seeing other men. Shannon was taking antipsychotic medication to deal with schizophrenia. Without medication Shannon heard voices telling her to do things. Other than visiting Jennifer regularly and completing a psychological evaluation, Michael had not complied with the reunification plan. The psychologist performing the evaluation found Michael was of above average intelligence and cared for Jennifer. However, he concluded Michael was not an appropriate caretaker for the minor and that long-term psychotherapeutic intervention was required. He therefore opined that serious consideration should be given to termination of parental rights and adoption.
In July 1991 Shannon underwent psychological evaluation. At the time she was again living with Michael and had prematurely given birth to another baby. The baby remained in the intensive care unit at the hospital. The evaluator found Shannon had a borderline level of intelligence and serious psychological limitations and that she suffered from polysubstance abuse. Because of her psychological and intellectual limitations, the evaluator concluded Shannon was not capable of properly parenting her children and that placement of the children with her would place them in danger of severe neglect.
Michael underwent another psychological evaluation in July 1991. He was diagnosed as suffering from a personality disorder with avoidant, inadequate, and narcissistic features and alcohol dependence in remission. Michael showed an impressively improved emotional state from the time of his first evaluation but the evaluator concluded it would be very difficult for him to assume the role of his children's principal caretaker.
The review report prepared for the 12-month hearing in October 1991 indicated that Michael and Shannon were again living together. Michael was receiving Supplemental Security Income (SSI) payments due to his neck injury and Shannon was receiving SSI payments due to her severe depression and schizophrenia. They were living in a small cluttered trailer. Michael reported Shannon had stopped using drugs. Both parents had visited regularly with Jennifer. Michael's visits went well but Shannon was inappropriate with Jennifer. She failed to keep the minor with her or attend to her needs. In one incident she tried to drive a car with Jennifer on her lap and told Michael to shut up when he told her not to do so. Both parents had made some progress in complying with their reunification plan including both completing parenting classes and Shannon drug testing and attending therapy.
An additional information report filed on the day of the originally scheduled 12-month review, stated Michael reported he had kicked Shannon out *709 because she was using drugs and that Shannon had been hospitalized in a psychiatric ward. Shannon claimed to have only taken prescription drugs and that her hospitalization had been for suicidal ideation and depression. Shannon reported she was now homeless. The hearing was continued. In an additional information report for the continued hearing it was reported the therapist had not seen either parent since August and that Shannon had missed her last visit with Jennifer. It was further reported that Shannon admitted she had relapsed and wanted to go into a drug rehabilitation program. The Department recommended reunification services be terminated and a hearing pursuant to section 366.26 be set.
At the 12-month review hearing held on November 18, 1991, the court found there was a substantial probability Jennifer would be restored to Michael by mid-March 1992 and that services offered to the parents should be continued. Michael was directed, inter alia, to see a new counselor for weekly counseling and to attend Narcotics Anonymous (N.A.), Alcoholics Anonymous, or a codependency group two times a week.
In the report for the 18-month review hearing initially held March 5, 1992, the social worker reported Shannon and Michael were still separated. It was further reported Shannon had not been consistent in her visits to Jennifer and was unable to maintain herself. Shannon had not followed through on substance abuse referrals.
On the other hand, Michael visited with Jennifer frequently, met weekly with his therapist and attended both N.A. and Co-Dependency Anonymous meetings. Michael attended parenting classes with Jennifer and on three occasions had Jennifer participate in his therapy. Michael had progressed to unsupervised visits. The social worker concluded Michael was working very hard on the reunification plan and progressing well. Michael's therapist recommended Michael complete his new parenting class and have increased visitation. The therapist concluded three or four months should be sufficient for Michael to demonstrate he was able to have Jennifer returned. The Department requested discretion to place Jennifer with Michael as soon as Michael was ready.
Shannon did not appear at the March 5, 1992, review and the court granted a continuance until April 6, 1992, for her to be given proper notice. At the time of the continued hearing Jennifer had been having overnight visits with Michael that were going well. His therapist recommended Jennifer be returned to Michael with ongoing services provided to consolidate Michael's progress. The Department recommended that Jennifer be placed with her father and services continued. The court acted in accordance with *710 the recommendation and set a review hearing for October. Shannon had again failed to appear for the hearing.
The report for the October review hearing reported Jennifer was doing well in her father's custody and that he was using the parenting skills he had learned. On the other hand, Shannon reportedly had not complied with drug testing, lived with different friends, had only erratically visited with Jennifer. Despite her performance Shannon asserted she had as much right to Jennifer as Michael and threatened to "take" Jennifer if that was what she had to do.
The report included a letter from Dr. Schramm, Shannon's therapist, who she had asked to write the Department. Dr. Schramm reported he had seen Shannon for therapy since August 1991. He reported that Shannon had represented she had completed drug rehabilitation counseling and had been drug free for approximately a year. Dr. Schramm indicated Shannon had made significant progress in that past year. He concluded it appeared prudent to allow her increased contact with her children with unsupervised and overnight visits. Dr. Schramm included a report that documented Shannon's extensive emotional and intellectual deficiencies. In particular it reported that Shannon's ability to anticipate the consequences of her behavior was impaired, that an emotional disturbance was suggested, that she might be impulsive, maladjusted, and emotionally unstable, and that she did not get along well with others.
At the October 1, 1992, review hearing, all parties were in agreement with termination of juvenile court jurisdiction. Michael urged that he be granted sole legal and physical custody. Shannon agreed that Michael could have sole physical custody but objected to his having sole legal custody. The court awarded Michael sole legal and physical custody and granted Shannon reasonable visitation rights supervised by a neutral third party. With respect to legal custody the court stated:
"The notion of legal custody is something, first of all, that I believe the court can rule on and is charged to rule on when making exit orders, so I think these issues are properly before the court. But the notion of legal custody is to have parents make cojoint decisions with respect to major decisions that are going to effect the life of the child, and I'm satisfied that Dr. Schramm's evaluation of the mother indicates that the mother sharing in that responsibility at this time is not particularly helpful, and the court feels it is more appropriately in the hands of the father at this time."
The court directed the exit orders be placed in the domestic file and terminated jurisdiction over Jennifer. Shannon appeals from the award of sole legal custody to Michael.

*711 DISCUSSION
Shannon contends the court abused its discretion by refusing to grant her request for joint legal custody. She argues a juvenile law court entering custody orders upon termination of jurisdiction is governed by Civil Code section 4600 et seq. applicable to family law custody and visitation orders. Her argument implies that since family law would apply in the future it must govern juvenile custody orders entered upon termination. Pursuant to that statutory scheme she contends she was entitled to a presumption that joint legal custody was in Jennifer's best interests and to a statement of reasons for granting or denying joint legal custody. (Civ. Code, § 4600.5, subds. (a) and (c).) Shannon further contends there was insufficient evidence to overcome the statutory presumption in favor of granting joint legal custody. Shannon takes the position she is harmed by the award of sole legal custody to Michael because in future family court proceedings there will be a presumption in favor of maintaining the status quo.[2]
The Department on the other hand contends the court's custody decision is governed by the Welfare and Institutions Code particularly section 304. It further contends the court properly exercised its discretion since the custody order was in Jennifer's best interest and supported by substantial evidence.
Shannon cites no authority supporting her position. As discussed below, her reliance on the Civil Code is misplaced.
(1) Dependency proceedings in the juvenile court are special proceedings governed by their own rules and statutes. (§ 300 et seq.; Cal. Rules of Court, rule 1440 et seq.) Unless otherwise specified,[3] the requirements of the Civil Code and the Code of Civil Procedure do not apply. (Jones T. v. Superior Court (1989) 215 Cal. App.3d 240, 245, fn. 3 [264 Cal. Rptr. 4]; In re Angela R. (1989) 212 Cal. App.3d 257, 273 [260 Cal. Rptr. 612].) Nowhere does the juvenile law with respect to custody determination specify that Civil Code section 4600 et seq. is to apply to the custody determinations within dependency proceedings.
The juvenile court has exclusive jurisdiction to make custody orders over dependent children as specified in the Welfare and Institution Code. (§ 304.) *712 Section 362.4 specifically provides that when the juvenile court terminates its jurisdiction over a dependent minor and proceedings for the dissolution of the marriage or for legal separation of the minor's parents are pending in the superior court, the juvenile court may issue an order determining the custody of the minor. Under the section, if no action relating to the minor's custody is pending in the superior court, the juvenile court order may be used as the basis for opening such file. The section also specifically provides that any order issued pursuant thereto shall continue until modified or terminated by a subsequent order of the superior court.
In In re Roger S. (1992) 4 Cal. App.4th 25 [5 Cal. Rptr.2d 208], the court recently held that section 362.4 authorizes the juvenile court when terminating jurisdiction to make custody and visitation orders that will be transferred to a family court file and remain in effect until changed by the superior court. (In re Roger S., supra, 4 Cal. App.4th at p. 30.) In discussing the focus of the determinations as being in the best interests of the child the court emphasized the importance of the standard stating that "the juvenile court has a special responsibility to the child as parens patriae and must look at the totality of the child's circumstances." (Id. at pp. 30-31.) The court further distinguished between the juvenile court's role in determining the best interests of the child and the family law court's role in determining the best interests of the child as between two parents under Civil Code section 4600 et seq.
(2) The application of Civil Code section 4600.5, subdivision (a)'s presumption that joint custody is in the best interest of the minor is inconsistent with the purposes of the juvenile court.[4] Although both the family court and the juvenile court focus on the best interests of the child significant differences exist. In juvenile dependency proceedings the child is involved in the court proceedings because he or she has been abused or neglected. Custody orders are not made until the child has been declared a dependent of the court and in many cases, such as this one, the child has been removed from the parents upon clear and convincing evidence of danger. The issue of the parents' ability to protect and care for the child is the central issue. The presumption of parental fitness that underlies custody law in the family court just does not apply to dependency cases. Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.
(3) Shannon however argues that when the juvenile court enters an exit order and terminates dependency jurisdiction, it is finding that no protective *713 issue as to the child continues to exist. She therefore submits that where the court is terminating jurisdiction and neither parent's rights have been terminated or abridged, the Civil Code presumption in favor of both parents is restored. We disagree. The court here vested sole legal and physical custody in Michael. Shannon was only allowed reasonable visitation supervised by a neutral third party. The court's determination there was no protective issues was premised upon the existence of its custody and visitation order. The court did not find there would be no protective issues if Shannon had unsupervised visitation rights or joint legal or physical custody. To the contrary, the court's order indicates continuing concerns about Shannon's ability to protect and care for Jennifer in any but the most limited circumstances of supervised visits.
(4) Shannon contends there is no evidence in the record to suggest she should be deprived of shared legal custody. We cannot agree. While Shannon in court accepted the award of sole physical custody to Michael, outside of court she was expressing anger with his having such custody and threatening to take Jennifer if necessary. She did not follow through on drug rehabilitation referrals and failed to drug test while assuring her therapist she was drug free and had completed rehabilitation. She was irregular in her visitation with Jennifer and angry about restrictions upon the conduct of those visits. There were reports of Shannon acting inappropriately with Jennifer during visitation. Shannon had an extensive history of serious mental illness.
The report by her own expert showed she had significant emotional disturbances and developmental and learning disabilities. Dr. Schramm's report indicated Shannon's ability to anticipate the consequences of her behavior and her ability to form general concepts when faced with new leaning situations was impaired. He also reported Shannon withdrew from and did not get along with others and further reported she may be impulsive, maladjusted, and emotionally unstable. While Dr. Schramm recommended increased and unsupervised visitation, his report viewed as a whole does not support Shannon's claim she is capable of sharing legal custody but rather supports the court's determination such participation would not be in Jennifer's best interests. Shannon's inability throughout these proceedings to care for herself and her children, her failure to make progress in overcoming the problems leading to Jennifer's removal, her inconsistency and inappropriateness in visitation, as well as Dr. Schramm's report amply support the court's decision Shannon's participation in making important decisions relating to Jennifer's welfare would not be in the child's best interests.
The Welfare and Institutions Code does not require a specific statement of reasons be given when making a custody order. Nor did Shannon request *714 such a statement. The court's order was sufficient to generally show the basis for its ruling. Shannon is not prejudiced by the court's failure to be more specific since the record is clear as to the circumstances leading to the denial of joint legal custody. Should circumstances change in the future Shannon is free to seek joint legal custody in the family law court.

DISPOSITION
The order is affirmed.
Todd, J., and Nares, J., concurred.
Appellant's petition for review by the Supreme Court was denied May 27, 1993.
NOTES
[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] Shannon additionally implies Michael's history of family violence made the award of sole legal custody inappropriate. This argument goes to Michael's fitness for physical custody, which Shannon is not contesting. It is totally irrelevant with respect to Shannon sharing legal custody, the only issue appealed.
[3] Examples of specific application of other codes include section 341 (subpoenas issued in accordance with Code Civ. Proc., § 1985) and section 362.4 (orders issued enjoining any action specified in Civ. Code, § 4359, subd. (a)(2) or (3)).
[4] We note that even if Civil Code section 4600 et seq. applied to custody determinations in exit orders, section 4600.5, subdivision (a)'s presumption may not apply since it is limited to situations in which the parents have agreed to an award of joint custody.