Filed 3/10/26  In re R.S. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re R.S., a Person Coming Under the Juvenile Court Law. | B346931 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.D.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 24CCJP02414A |

APPEAL from orders of the Superior Court of Los Angeles County, Linda Sun, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Eden Gharapet, Deputy County Counsel, for Plaintiff and Respondent.

Father appeals from the juvenile court's termination of its jurisdiction over his daughter R.S. and entry of a juvenile custody order awarding mother sole legal custody. He contends the evidence did not support the court's finding that its supervision no longer was necessary, arguing R.S. remained at risk in mother's care. Father also contends the court abused its discretion in not awarding him shared legal custody of R.S., when he was nonoffending and had acted in R.S.'s best interests. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Parents have several children together: R.S. (born April 2009), her younger sister C.S. (born August 2010), and their adult siblings Zoe and twins Skylar and Scarlett. Only R.S. is the subject of this appeal. Mother is not a party.

### 1. *The family's history*

In 2006, Zoe, Skylar, and Scarlett were declared dependents of the juvenile court. The sustained petitions included counts related to an altercation between parents and mother's emotional problems, including suicidal ideation. The court terminated its jurisdiction in March 2007 with a custody order awarding joint custody to parents with mother having primary residence.

The Los Angeles Department of Children and Family Services (DCFS) also received several referrals about the family after R.S.'s birth. More recently, on January 1, 2021, law enforcement responded to a call about a verbal altercation between parents. Mother alleged father had been communicating online with underage girls and had made inappropriate comments to their teen daughters. Law enforcement took

2

father's computer and cell phone. The referral was "evaluated out."

Parents separated and mother filed for divorce. On March 9, 2021, mother was granted sole legal and physical custody of the children. Father was to have no contact with the children "absent prior written agreement with mother."[1] In April 2021, mother reported concerns—related to her earlier discovery about father—that the children had been exposed to pornography on father's phone and for C.S.'s mental health. The matter again was "evaluated out."

In November 2022, father was charged with two counts of violating Penal Code section 288.3(a) (contacting child with intent to commit specified crime) and one count of violating Penal Code section 311.11(a) (possession of child pornography) based on his alleged contact and communication with minors. Father was arraigned and pleaded "not guilty."

In November 2023 DCFS received another referral alleging general neglect by mother that it deemed unfounded. C.S. had expressed suicidal ideation. She reported mother worked as a flight attendant and frequently was away from home. C.S. stated she, R.S., and their older siblings (then 17 and 20) looked after themselves when mother was away. C.S. reported she had been drinking alcohol and getting drunk at home. R.S. had been in the hospital following a suicide attempt (wine and pills). The children denied that mother gave them alcohol or that she knew

---

[1] The marriage was dissolved in January 2023. Parents' stipulated judgment was entered in March 2024, including a final order granting mother sole legal and physical custody of the minor children. Father agreed to have no contact with the children without mother's written permission.

3

they had been drinking.  They said they were in constant contact with mother, and an adult sister and their maternal grandmother cared for them when mother was gone.

## 2.     *Investigation of current petition and detention*

R.S. and C.S. came to the juvenile court's attention on August 2, 2024, when DCFS filed a petition under Welfare and Institutions Code[2] section 300 on their behalf.  On January 21, 2025, the court sustained one amended count of the petition finding R.S. and C.S. "have mental and emotional issues, including depression and anxiety.  Mother . . . is currently temporarily incapable to properly care for the children [*sic*], in part due to her anxiety and depression.  Such condition places the children a[t] risk of physical and emotional harm."[3]

DCFS had received a report in June 2024 that mother argued with then 15- and 13-year-old R.S. and C.S., and their almost 18-year-old sister Scarlett, after R.S. and Scarlett left the house without permission to see their boyfriends.  Mother yelled at them and threw a ceramic "container" on the floor that broke near the children, scaring them.  The children were unhurt but called 911.  The report stated "daughters seem[ed] to be misbehaving and not listening to mother," but they also had said mother "made comments about ending her life."  The children did not feel safe with her.  Mother was placed on a temporary psychiatric hold.  Maternal grandmother stayed with the children.

---

[2]     Statutory references are to the Welfare and Institutions Code.

[3]     The court dismissed the remaining counts and found father was "nonoffending on the petition as sustained."

4

The social worker called father on July 9, 2024. He confirmed mother had sole legal and physical custody. Father said he had an open criminal case that he claimed mother had " 'orchestrated.' " Father said he last saw the children on December 31, 2020. Mother would not allow him to see them. Father was concerned about the children in mother's care.

On July 17, 2024, the social worker interviewed R.S. and C.S. at the DCFS office. They asked to speak to the social worker alone, so they could "tell the truth." The children said mother frequently made comments about wanting to kill herself and wanting to kill them, Scarlett, and father. They described mother's moods as "unpredictable" and said she was " 'short tempered.' " Mother had thrown things "at or around [them] to scare and intimidate them." The children also said mother drove erratically, making them anxious when in the car with her. R.S also said mother had bought her cigarettes and alcohol.

The children said mother made "threats . . . about 'telling the truth.' " They felt anxious and sad, and "overwhelm[ed]" by "mother's outbursts." R.S. said she had depression, anxiety, and PTSD; she had been prescribed Lexapro. R.S. had participated in therapy, but mother "took [her] out" when the therapist "reported concerns." Mother wouldn't re-enroll her when R.S. asked. C.S. also had been diagnosed with anxiety and depression and prescribed medication. She had been hospitalized from November 2023 to January 2024; her continuation of care plan included therapy, but mother did not enroll her.

The children denied any abuse or sexual abuse by father, or feeling unsafe with him. They'd asked about father and wanted to see him, but mother told them a court order prohibited it. They would rather live with father.

5

The social worker interviewed mother with her retained counsel. Skylar, R.S., and C.S. lived with her. When she turned 18, Scarlett decided to live with father. Mother said father and paternal grandmother were trying to convince the children that father "was 'framed' for his criminal case." Mother believed they "were 'encouraging defiance' in the children."

As for the ceramic container incident, mother said the children didn't go to school that day. She " 'knocked over' " a jar while telling them they had to clean if they were going to stay home. She denied making any comments with suicidal intent or driving erratically. Mother said her children were " 'beyond teenage rebellion.' "

Mother told the social worker she had no mental health diagnoses at that time but was in therapy. She said both R.S. and C.S. had "anxiety, depression, and struggle[d] with eating disorders." Both girls had received treatment and seemed to be doing better. Both took medication managed by their pediatrician.

Mother denied having given the children drugs, alcohol, or cigarettes. When R.S. told her she was " 'dependent on nicotine,' " mother gave her " 'herbal cigarettes' " to "address her addiction." She denied giving the children nicotine. The social worker asked about R.S.'s fall 2023 suicide attempt. Mother had been out of town for work at the time. She put R.S. in an inpatient program. Mother said they "went to multiple facilities to follow up after treatment," including an eating disorder specialist. Within the last month, R.S. had said she no longer needed help.

Mother mentioned father's criminal case. She said she first became aware that he "possibly" was " 'a pedophile' in December

6

2020/January 2021" when she found "concerning items" on his computer. Mother also found messages to and from underage girls and nude photos on his phone. Mother said father—as part of a " 'nasty clown character' "—had used a " 'creepy voice' " and asked the children to sit on his lap, pretending to "fondle" them.

On July 31, 2024, DCFS obtained an order to remove R.S. and C.S. from mother and father. Paternal grandmother agreed to take the children. Father—with the social worker's permission —greeted the children outside grandmother's home. They exchanged hugs, and the children told him they had missed him. The social worker explained their contact had to be monitored. Paternal grandmother was an approved monitor.

DCFS filed the section 300 petition, and the court ordered the children detained from parents. Minor's counsel informed the court the children wished to be released to father, but she could not join in their request due to father's ongoing criminal case. The children did not want to see mother. The court found it was "abundantly clear that the children do not feel safe with the mother." The court also found father's criminal case was "very concerning." The court ordered monitored visits for parents twice a week, for two hours each visit. Father's visits were to be in a neutral setting. Mother's visits were to be in a therapeutic setting to "minimize . . . the trauma and the emotional distress that the children may suffer."

3. ***Further investigation and adjudication***

DCFS filed its initial jurisdiction/disposition report on September 5, 2024. In August and early September 2024, the dependency investigator (DI) interviewed the children, their siblings, mother, the grandmothers, and others about the allegations. R.S. and C.S. essentially repeated what they already

7

had told the social worker.  They added they began " 'having issues' " and/or suicidal ideation after father was " 'kicked out' " when mother discovered he had been talking to underage girls. R.S. said mother " 'tried to frame' " father.  The children said mother "diverted her anger" from father to them and "started yelling at them more."  R.S. told the DI, " 'I want to stay with my dad, . . . he is a normal parent.' "

Adult sibling Zoe had no concerns about R.S. and C.S. in mother's care.  She denied mother had suicidal ideations and didn't know of any history of mental illness.  Maternal grandmother also denied her daughter had a history of mental illness.  Skylar, then 18, told the DI that R.S. and C.S. were " 'making accusations of abuse in the house and that is false.' " He thought father and paternal grandmother had made his younger sisters believe " 'there is something better.' "  He said, " 'What they do not like about my mom's house is that there are rules.' "  Skylar denied mother had given his sisters alcohol or that mother had a history of mental illness or suicidal ideations. Zoe also denied mother had given them alcohol.  Zoe said her sisters had gotten into mother's cooking alcohol, even after mother had locked it up.  Scarlett, however, repeated the allegations about mother's death threats and suicidal statements, and that mother had given them alcohol and R.S. cigarettes. She also said mother had "cornered [her] with a knife" once. Zoe denied mother ever threatened any of them with a knife.

Mother believed father had manipulated Scarlett, R.S., and C.S. into making false allegations.  She again denied suicidal ideation.  She also denied threatening to kill father or her children.  Mother denied prohibiting the children from

"disclosing information to DCFS." She again denied giving the children alcohol or R.S. nicotine.

The DI found no safety concerns in mother's home. Mother showed the DI the locked cabinet where she stored alcohol and a locked closet where she kept medication. Mother gave the DI certificates of completion of anger management and parenting courses.

Paternal grandmother told the DI the children had called her and said mother had threatened to kill them. Father was visiting in the evenings to have dinner with the girls and to help them with homework. Paternal grandmother had taken the children to court at father's attorney's request. The social worker told her the children should not attend court for father unless subpoenaed. Father declined to be interviewed by the DI until he consulted with his criminal defense attorney.

New allegations arose during the investigation. The family's former nanny revealed that, in February 2023, Scarlett had told her that once, when she was in the bathtub with R.S., father had walked in with his phone as if he were checking on them, but she thought father was recording them. The nanny said R.S. confirmed it was not the first time father had walked in on them while they were in the shower. The nanny didn't tell mother what the girls had said until recently after mother had called to say the girls had " 'left to their father.' " Mother confirmed that, at the time, she had been unaware of what the children had disclosed to the nanny. She said she "never had any suspicions of father being inappropriate with their children." Zoe told the DI father had pretended to walk in on her accidentally while she was bathing, and he had asked

her sisters—mostly Scarlett—" 'about their sex life and who they were dating.' "

The DI questioned R.S. and C.S. about the allegation. C.S. denied it ever happened. R.S. said, if father had gone into the bathroom, it was only to grab something. At the adjudication hearing, R.S. testified that, when she was about nine years old, father walked into the bathroom with his laptop to grab something while she and Scarlett were bathing. Scarlett told her the recording light was on, but R.S. never saw the light.

DCFS's September 5 report also informed the court that, on September 3, the DI had received a "frantic call" from Zoe and mother. They were on the way to get R.S., who had called them, "upset and begging them to pick her up because bad things were happening to her" at paternal grandmother's house. Among other things, R.S. said she woke up one night without her shirt. Paternal grandmother's boyfriend asked her, " 'how did you sleep, did you have any disturbances at night, how can you sleep with your legs entangled.' " R.S. assumed he had walked in while she and C.S. were sleeping in their shared room. The DI told mother she could not show up at paternal grandmother's home; DCFS would investigate.

Law enforcement went to the home. A deputy spoke with R.S. privately outside. R.S. said Scarlett and father visited the home, and father " 'periodically' stay[ed] over." R.S. later "retracted" that statement and told the deputy father only visited. She told the deputy Scarlett gave her "weed and nicotine." She said father was aware of her drug use and told her not to get "caught." (In later testimony, R.S. clarified father "didn't know while I was doing it. He knew after and told me something like, don't be stupid about it and especially don't

10

get caught. [¶] So he said that I shouldn't be doing it at all but I continued with that.") R.S. also told the deputy that, two weeks earlier, she woke up not wearing her shirt. She said " 'it was weird' how [paternal grandmother's boyfriend] was asking questions about how she slept that night and if she was disturbed." Mother and Zoe arrived at paternal grandmother's home but did not contact R.S. The deputy reported R.S. said she was concerned for her safety. R.S. also "made a statement of wanting to harm herself by cutting herself," so the deputy planned to take R.S. to the hospital.

In the meantime, mother, through counsel, had filed a "walk-on request" late that night asking that R.S. and C.S. be removed from paternal grandmother's home. The request stated R.S. had "contacted" Zoe, mother, and mother's friend that evening and told them that she "was being physically, emotionally, and mentally abused by paternal grandmother, . . . paternal uncle, . . . and paternal grandmother's boyfriend." R.S. told them she had become suicidal, may have been sexually abused, and wanted to return to mother's home. The request noted R.S. had been taken to the hospital due to suicidal ideation.

DCFS filed a last minute information (LMI) report on September 11, 2024. R.S. had been discharged from the hospital on September 9 and placed in a foster home. While in the hospital, R.S. told the social worker she used marijuana and nicotine at school. C.S. remained in paternal grandmother's home. C.S. told the social worker she felt safe there, and she didn't think paternal grandmother's boyfriend entered her and R.S.'s room; she would have heard him, and the dogs would have barked.

The court heard mother's request on September 12, 2024, but found it moot. Mother's counsel asked that R.S. be released to mother or, alternatively, for her visits to be unmonitored and the therapeutic setting restriction lifted. R.S.'s attorney objected to moving R.S. from her foster placement. Father's counsel asked the court to admonish mother about contacting the children and attempting to influence them. R.S. was at the hearing and left the courtroom after becoming "visibly upset."

The court did not change mother's visitation order but allowed her to visit R.S. after court. The court stated, "[W]e can tell that [R.S.] is overwhelmed with all of this animosity and all of this bickering surrounding her. It appears that she does not even want to be in court to face all of this conflict. So after the court visit, I will only allow the mother to visit [R.S.] in shelter care." On September 18, counsel for DCFS filed a stipulated attorney order allowing mother to have visits with R.S. at a DCFS office monitored by staff, which the court signed on September 24.

DCFS filed an addendum report on September 25. R.S. was receiving services through an intensive mental health program. C.S. was receiving individual therapy and psychiatric services. DCFS reviewed a transcript of a recording mother had made of the September 3 telephone conversation among mother, mother's friend, Zoe, and R.S. DCFS noted the first 10 minutes of the conversation had not been recorded, and it appeared R.S. had been asked leading questions. Mother told R.S., " '[Y]ou'll have to say that the environment has become frightening to you, you know? Like you'll have to elaborate for them so that they understand not to make you go right back.' " DCFS was "gravely concern[ed]" that mother and the family friend "were plotting

12

to pick up [R.S.] to take her to the police station" despite the DI having told them not to go to the home.

The DI interviewed R.S. R.S. said she had thought paternal grandmother and father " 'wanted me there because they cared and wanted what was best for me but I realized that they do not care and what my mom said was true.' " R.S. stated paternal grandmother did not believe her when R.S. told her she was having panic attacks and suicidal ideations. R.S. wasn't allowed to call Skylar or Zoe and was " 'told to leave my old life behind.' " R.S. stated, "My mom was not abusive, she makes me feel supported she is a good mom, I want to go back home." R.S. said father and Scarlett had "influenced [her]"—Scarlett had said "there were no rules" at father's house.

R.S. now denied mother had threatened to kill her or her siblings, or given her alcohol or nicotine. R.S. admitted mother gave her herbal cigarettes to help her " 'we[a]n off the vap[e].' " She added mother once bought " 'nicotine and gave me one a day until I we[a]ned off.' "

The DI called paternal grandmother about R.S.'s removal. She said "it all started" when R.S. had gone out dressed "regularly" and returned "dressed like a 'street walker.' " R.S. brought her boyfriend to a family beach day without permission and went off alone with him. Paternal grandmother denied abuse or neglect. The DI also spoke to Scarlett and C.S. They both said R.S. didn't like the rules at paternal grandmother's house. C.S. said R.S. was sneaking out of the house at night.

The addendum report concluded:

> "[I]t is hard to decipher where the truth lies as the events continue to evolve[,] each time changing. However, it is clear that the parents['] . . .

tumultuous relationship resulted in a custody battle that negatively impacted [R.S.] and [C.S] and the relationship with their parents. It appears that after the parents['] separation, the children have been burdened and have been subjected [to] constant disparaging remarks of each other and comments heard from older siblings about past DV, substance abuse by father, mother's mental and emotional problems and father's criminal complaints. The behavioral and emotional problems exhibited by the children have been present since long before June 2024 evidenced by their 5150 hospitalizations due to suicidal ideations. However, mother alleges that the issues started when the children were coached by paternal family. The children began to act out and the mother has lacked the ability to respond effectively to children's unresolved mental and emotional problems."[4]

The adjudication hearing began on September 26, 2024. Mother's counsel questioned R.S. under oath in chambers. R.S. testified father and paternal grandmother told her about father's criminal case while she was at grandmother's house. They told her mother "framed" father, but they didn't tell her to say that to anyone. R.S. also testified someone—she didn't remember who—had told her to tell the DI that mother threw the ceramic container close to her instead of at the ground.

---

[4] A later LMI noted there was "significant division" between mother's and father's families, making it "difficult to assess the truth." R.S. seemed to be aligned with mother's side of the family, and C.S. with father's.

14

R.S. didn't know if mother was suicidal, but mother said things that made R.S. "concerned" for her. Sometimes mother "was really good and very stable," and other times "she would get too stressed out and too upset with things." R.S. testified she never saw mother engage in "violent and assaultive behaviors" toward her siblings. She had seen mother throw things in her siblings' presence but not at them. R.S. had gone "a few weeks without" her Lexapro when mother forgot to fill the prescription. R.S. believed mother had addressed her mental health needs, but not C.S.'s. R.S. had heard mother call C.S. derogatory names.

R.S. also admitted she regularly had unsupervised visits at father's home—a one-minute walk from paternal grandmother's house. Paternal grandmother didn't know about it. As for her September 3 call, R.S. testified she "was feeling depressed." She wasn't suicidal "because of anything that anyone in particular did. It was a build-up of things . . . . [¶] I was feeling not welcomed at my grandmother's home, so that definitely affected it." R.S. testified she wanted to return to mother's home, felt safe with her, and was willing to participate in therapy with her.

The hearing was continued.[5] DCFS filed an addendum report on October 21, 2024, summarizing the children's medical records. R.S had been in the hospital from September 15 to 17, 2023, after her overdose on wine and Lexapro. She then was admitted to an inpatient facility from September 26 to October 1, 2023. There, R.S. reported a history of cutting her arms and thighs. Mother signed R.S. out of treatment "against clinical

---

[5]     In the interim—at mother's insistence—her retained counsel moved to withdraw. On October 15, the court granted mother's substitution of attorney retaining new counsel, declared a mistrial, and set new hearing dates for December 2024.

15

advice."  (Mother had told the DI R.S. was miserable there.)
The facility recommended R.S. remain in residential treatment.
She was not an imminent risk to herself or others at discharge,
however.  On November 28, R.S. was admitted to a behavioral
health hospital; she was discharged on December 2.[6]  Her
discharge plan included outpatient psychiatric follow-up along
with taking Lexapro.  The children's pediatrician confirmed
she had seen R.S. and C.S. "all their lives."  She couldn't recall
the frequency with which she saw the children for medication
management, but said it was common for pediatricians to
prescribe psychotropic medications.

DCFS noted mother had not provided evidence that she
had followed the medical providers' recommendations, and she
"did not enroll[ ] the children in mental health services other
than having their prescription[s] filled by their pediatrician."
DCFS concluded it was "evident that the children have been
suffering for a long time."  DCFS recommended they be declared
dependents and ordered suitably placed.

In its December 4, 2024 LMI, DCFS reported R.S. had
had consistent visits with mother, monitored by maternal
grandmother.  DCFS was concerned, however, that either mother
was having unmonitored telephone contact with R.S., or maternal
grandmother was allowing mother to discuss case-related issues
with R.S.  R.S. continued to receive mental health services and
was under the care of a psychiatrist.  The psychiatrist said R.S.

---

[6]     C.S. had been admitted to the behavioral health hospital
from November 18 to 27, 2023 for attempted suicide and to an
inpatient facility from November 28, 2023 to January 17, 2024.

16

was receptive to services and had spoken about her family's unhealthy dynamics, including fighting between parents.

The court set a mandatory settlement conference. The matter did not settle and the adjudication hearing again was continued to January 21, 2025. In its LMI filed January 17, DCFS reported R.S. wanted to go home with mother, "but also want[ed] to move slowly in order to make sure that mother has changed." R.S.'s main concern was mother's anger management. R.S. said mother talked to her about the court case despite R.S. having asked her to stop. R.S. told the social worker that parents "talk[ed] badly" about each other, and she didn't "know who to believe." R.S. was happy in her foster home. She was not ready to talk to father.

DCFS reverted mother's visits to be monitored by DCFS staff or a professional monitor instead of maternal grandmother. Mother denied bringing up the case with R.S. She said R.S. had asked questions and she didn't know how to respond. C.S. still declined visits with mother and was having monitored visits with father.

DCFS attached a letter from mother's psychologist summarizing her mental health treatment. Mother had participated in voluntary therapy from August 17, 2021 through October 10, 2022, to address her concerns about father. Mother had returned to therapy in September 2024. She had attended two to three sessions a month from September 19 through December 17, 2024, the date of the letter. The psychologist noted mother had "been processing her anxiety and frustration around her family situation" over the past few months. Mother's "priorities are to bring her kids home, to provide them with whatever support they need, to continue to develop her own

parenting skills, and to strengthen the family unit through family therapy." They had been discussing "healthy ways to respond to defiant teenagers with loving boundaries." Mother was "open to gaining new skills in this area." The psychologist had no reservations about mother "welcoming her kids back home." The psychologist stated mother never exhibited "suicidal ideation or suicidal behavior" during their interactions.

DCFS also included a letter from the psychiatrist who had treated mother during her psychiatric hold in June 2024. Mother had "appeared calm, cooperative, with no signs or symptoms of depression." As there was "no clinical evidence for depression," mother was discharged. The doctor noted his observation of mother, and the reports of other family members, were consistent with her statement on arrival that "this was a misunderstanding and a family dispute."

DCFS noted father had completed a four-hour parent education and family stabilization course, but it was not a "complete parenting course."

At the adjudication hearing mother pleaded no contest to the petition as amended and sustained. The court declared R.S. (and C.S.) a dependent of the juvenile court and gave DCFS "ongoing discretion to liberalize Mother's visitation" with R.S. and father's visits with C.S. The court set a contested disposition hearing for February 21, 2025.

**4.      *Disposition and termination of jurisdiction***

In its February 13, 2025 addendum report, DCFS noted mother, based on her reading of recent court orders, "is now adamant that she is permitted to attend" R.S.'s therapy and medical appointments. R.S. did not want mother to attend either. DCFS recommended R.S. remain removed from parents.

18

In an LMI filed February 21, DCFS changed its recommendation. DCFS, after a case conference, now recommended R.S. be returned to home of mother because: R.S. repeatedly had asked to be returned to mother's care; at 15 years old, R.S. could express any emergent "needs or concerns"; visits between R.S. and mother had "been positive and no concerns ha[d] emerged"; and R.S.'s return to mother—who was concerned about R.S.'s medical care—would give mother "the opportunity to diligently address her medical needs." DCFS also had liberalized father's visits with C.S. to unmonitored, twice a week.

At the disposition hearing, R.S.'s counsel submitted on DCFS's recommendation. DCFS still recommended removal of both children from father with monitored visits for R.S. and unmonitored visits for C.S. The court ordered R.S. released to home of mother. The court noted, "Mother seems to have completed a lot of services that the court did not order, but referred her to during . . . a period of several months." The court also noted counsel hadn't expressed any safety concerns. The court removed R.S. from father, and C.S. from both parents. The court found it could not ignore "the fact that there is a pending criminal case against the father, and that is substantially related to his care of . . . the minor daughter." The court ordered father's visits with both children were to be unmonitored.

For mother's case plan, the court ordered conjoint counseling with R.S. and C.S., a parenting program, individual counseling to address case issues, and that mother schedule/ complete R.S.'s medical appointments immediately and provide DCFS with medical information. For father, the court ordered random and on-demand drug testing upon reasonable suspicion

19

of use, conjoint counseling with R.S. and C.S., and individual counseling to address case issues and sexual abuse awareness. The court set a three-month progress review hearing.

In its interim review report filed May 2, 2025, DCFS noted R.S. was current on her medical and dental visits and was participating in physical therapy and mental health services. R.S. had had no worries or concerns since returning to live with mother and adult sibling Zoe. She wanted to remain in mother's care. R.S. continued to refuse contact with father. She told the social worker she was "open to saying hello to father" during the exchange for sibling visits with C.S., however.

C.S. also was up to date on her medical and dental visits and receiving individual therapy. The therapist had approved conjoint therapy between C.S. and father but had not yet conducted a joint session. C.S. wanted to live with father and felt safe with him. She had begun overnight weekend visits with father. C.S. refused to visit mother.

Mother was in individual counseling, but R.S.'s therapist had not yet referred mother and R.S. to conjoint counseling. Father was receiving individual counseling but had not yet completed a psychological evaluation. Father's criminal case was still pending. DCFS stated there were "no apparent safety concerns with mother or father at this time." DCFS recommended the court terminate its jurisdiction over R.S. and give mother physical and legal custody. DCFS recommended C.S. be released to father's care and that father receive family maintenance services.

DCFS filed LMIs on May 12 and 15. An update from mother's therapist stated mother's sessions focused on how she could support R.S.'s physical and emotional wellbeing

20

through "healthy communication, firm and loving boundaries, and ancillary services." Father also was attending therapy consistently and was "working on addressing sexual boundaries and communication."

At the May 23 hearing, R.S.'s counsel submitted on DCFS's recommendation to close the case. Counsel stated R.S. still didn't want "any visits with her father at this time." Father's counsel asked the court to keep R.S.'s case open, noting father had not yet had an opportunity to participate in conjoint counseling with R.S. Counsel also asked that, if the court were to terminate jurisdiction, father's visits remain unmonitored and he be granted joint legal custody. Counsel noted father respected R.S.'s choice as to visits. Counsel argued, however, that—as there were no reported safety concerns—and father was in full compliance with his case plan, there was no reason father shouldn't have joint legal custody. Counsel for DCFS didn't "see an issue" in maintaining father's visitation "as is," with the "understanding that everybody has and would respect [R.S.]'s wishes." Counsel thought the recommendation for sole legal custody was "based somewhat" on R.S.'s "wishes not [to] have father involved in decision making processes for her." Counsel agreed father had complied with his case plan and submitted the issue to the court.

The court found the conditions that would justify the initial assumption of jurisdiction under section 300 no longer existed and were not likely to exist if supervision were withdrawn from R.S.'s case. The court terminated its jurisdiction, awarded mother sole physical and legal custody of R.S., and granted father unmonitored visits, twice a week, for two hours each visit, with

21

visits to be determined by R.S.'s therapist and based on R.S's wishes.  The court stated:

> "I make this order taking into [R.S.]'s best interests in mind [*sic*] because in the last couple of months, [R.S.] has been in her mother's care.  She is thriving. . . .  [H]er mental health has been stabilized.  She's earning excellent grades.  She has really flourished under her mother's care. [¶] . . . I am . . . very, very proud of [R.S.] for the very short time period she has shown so much progress. [¶] The case came in because of her mental health, and there was a lot of instability mentally and emotionally in her life at that time.  She has proven that in the mother's home that she has been stabilized in large part.  And we do not want to have that disturbed.  And also based on her statements to the social worker[,] . . . she made her wishes very clear that she feels safe under her mother's care, and that she would feel distressed and pressured if she is forced to have visits with her father."

The court stayed termination of jurisdiction pending receipt of the custody order.  On May 30, 2025, the court entered the juvenile custody order giving mother sole legal and physical custody of R.S., lifted the stay, and terminated its jurisdiction.  Father timely appealed.

## DISCUSSION

### 1. *Substantial evidence supported the court's decision to terminate its jurisdiction*

The juvenile court conducts periodic review hearings under section 364 when a child has been adjudged a dependent of the

juvenile court but remains in—or has been returned to—
a parent's custody.  (See *In re J.M.* (2023) 89 Cal.App.5th 95,
110 (*J.M.*); *In re N.S.* (2002) 97 Cal.App.4th 167, 171–172.)
At each hearing, the court "shall determine whether continued
supervision is necessary."  (§ 364, subd. (c).)  The court "must
terminate dependency jurisdiction unless either the parent,
the guardian, the child, or the social services agency establishes
by a preponderance of the evidence that the conditions justifying
assumption of jurisdiction exist or will exist if supervision
is withdrawn."  (*In re Aurora P.* (2015) 241 Cal.App.4th 1142,
1155–1156 (*Aurora P.*); § 364, subd. (c).)

"When proceeding under section 364, because the child is
in placement with a parent, the [juvenile] court is not concerned
with reunification, but with determining whether continued
supervision is necessary in the family home."  (*In re Gabriel L.*
(2009) 172 Cal.App.4th 644, 650.)  Considering the totality
of the evidence (*Aurora P., supra*, 241 Cal.App.4th at p. 1155),
the juvenile court must determine whether ongoing supervision
is "necessary to protect the child from harm" (*In re D.B.* (2020)
48 Cal.App.5th 613, 624).  When the social services agency
has recommended termination of jurisdiction, termination is
the " 'default result' " unless the parent objects—as father does
here—and then establishes the existence of conditions justifying
retention of jurisdiction.  (*Aurora P.,* at p. 1163.)

We generally review an order terminating jurisdiction
for substantial evidence.[7]  (See *Aurora, supra*, 241 Cal.App.4th

---

[7]	Both parties assert the substantial evidence standard
of review applies, although some courts have applied the abuse
of discretion standard.  (See, e.g., *In re Destiny D.* (2017) 15

at p. 1156; *In re J.F.* (2014) 228 Cal.App.4th 202, 209 (*J.F.*).) Because father—the appealing party—failed to carry his burden of proof below, we determine "whether the evidence compels a finding" in his favor "as a matter of law" by examining whether father's evidence was "(1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support [the court's] finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled in part on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010 & fn. 7; *J.M., supra*, 89 Cal.App.5th at p. 111.)

Father contends the evidence does not support the court's decision to terminate its jurisdiction. He argues the record affirmatively shows R.S. remained at risk in mother's care. Father describes the children's statements and reports of mother's mental health issues and conduct that led to R.S.'s removal, including: mother's threats to kill herself, the children, and father; her throwing of objects in anger; the fact she told the children not to disclose what was happening at home; her failure to address R.S.'s (and C.S.'s) mental health needs and to fill R.S.'s prescriptions; and the children's statements that mother had endangered them by driving erratically and giving them alcohol and cigarettes. Father argues mother also "brazenly flouted explicit court orders" by having unmonitored contact with R.S. and talking about case issues with her. Father notes R.S. recanted some of her earlier statements about mother in September 2024, when she wanted to leave paternal

Cal.App.5th 197, 211–212 (*Destiny D.*).) We would affirm under either standard.

24

grandmother's home, but then testified consistently with her initial statements.

As DCFS states, "[t]here is no doubt that this case involves contentious family dynamics, with both mother and father making various claims against one another." DCFS agrees "the family dynamics directly impacted [R.S.'s] mental health." During its investigation, DCFS also acknowledged its difficulty in determining "where the truth lies as the events continue to evolve[,] each time changing." A social worker noted "it [was] difficult to assess the truth from several of the adults involved." The court had before it DCFS's reports and their description of the statements—many of which were contradictory or inconsistent—made by the adults and children throughout the case. The court also heard—and was able to evaluate—R.S.'s testimony. The juvenile court was in the best position to assess the credibility of the individuals involved and the weight to give their statements. (See *J.F., supra*, 228 Cal.App.4th at p. 209 [reviewing court does not "reweigh the evidence, evaluate the credibility of witnesses, or draw inferences contrary to the findings of the trial court"].) Indisputably, the evidence father discusses showed mother had neglected R.S.'s and C.S.'s mental health needs, complicated by her own mental health issues. That was the basis for the court's jurisdictional finding—that mother, "in part due to her anxiety and depression," was "*temporarily* incapable" of properly caring for her children. (Italics added.) No one is arguing the juvenile court's original detention of and assertion of jurisdiction over R.S. was unwarranted. Indeed, mother pleaded no contest to the petition as sustained.

But a juvenile court should maintain dependency jurisdiction only so long as is necessary to protect the child

25

from the risk of suffering serious harm.  (See *Destiny D.*, *supra*, 15 Cal.App.5th at p. 208 ["the fundamental goal of the dependency system [is] to return the child to his or her custodial parent and terminate dependency jurisdiction as soon as circumstances permit"].)  We conclude substantial evidence supported the juvenile court's finding that—by the time of the May 23, 2025 progress hearing—R.S. no longer was at risk in mother's care.

Although DCFS and R.S.'s counsel had reported concerns about mother's conduct and her ability to safely care for R.S. *in the past*, by May 2025—about nine months after R.S.'s initial detention—neither reported any safety concerns.  Three months earlier, at disposition, the court had returned R.S. to mother's custody.  Neither R.S.'s counsel nor father's counsel objected to R.S. returning to mother's care.  R.S.'s counsel also submitted on DCFS's recommendation that the court terminate its jurisdiction.  The juvenile court could infer counsel would not have done so had counsel had any concerns about R.S.'s safety.  Earlier in the case, R.S.'s and C.S.'s former joint counsel had informed the court of the girls' request to be released to father but stated she could not join in that request due to his ongoing criminal case.  Similarly, if counsel had had any concerns about the court terminating its jurisdiction, counsel would have relayed R.S.'s wishes while voicing her objection.

In the court's words, R.S. was "thriving" and "ha[d] really flourished under her mother's care."  The court also found R.S.'s mental health had stabilized while in mother's home.  The evidence supported the court's findings.  Since returning to mother's care, R.S. was up to date on her medical and dental visits.  She was meeting with a therapist and behavior specialist

26

weekly. The therapist reported R.S. was "learning healthier coping skills to triggers and [to] reduce symptoms of anxiety." And she "consistent[ly] . . . attend[ed] psychotherapy sessions." R.S.—who was 16 years old when the court terminated its jurisdiction—reported she was "happy and safe" in mother's home and expressed no worries or safety concerns. Zoe, R.S.'s adult sister, also was living in the home.

Father argues, "[t]he notion that mother's long-entrenched mental health struggles, and serious neglect and abuse of her children, suddenly vanished on February 21, 2025, just six months after the juvenile court insisted that all contact between the children and mother must be in a therapeutic setting to 'minimize the trauma and the emotional distress' mother caused the children [citation], is beyond the pale."

First, as we noted, father did not object to R.S.'s return to mother's care at the disposition hearing. Second, that mother may have had mental health issues she continued to work on does not compel a finding that R.S. remained at substantial risk of harm in mother's care requiring continued court supervision. Rather, substantial evidence supported the court's implicit finding that mother no longer was unable to care for R.S. due to her own mental health issues. As of the February 21 disposition hearing, mother had made "substantial" progress "toward alleviating or mitigating the causes necessitating" R.S.'s placement. She had completed a parenting class and an anger management course, had completed a psychiatric evaluation, and was participating in individual counseling. The evidence showed that, after R.S. returned to her care, mother had continued to participate in two to four therapy sessions each month. Her therapist's May 13, 2025 update noted mother's

sessions during that period had focused on how she could support R.S.'s physical and emotional wellbeing. Mother's therapist viewed her as "a fit and loving mother" who "has been unwavering in her commitment to protecting her children." And mother and R.S. told the social worker they had worked on communicating openly, honestly, and with respect. Moreover, at the May 2025 hearing, father's counsel did not object to the court's termination of jurisdiction on the ground R.S. remained at risk of harm. Rather, father's counsel asked the court to keep R.S.'s case "open" because father and R.S. had not had "the opportunity to do conjoint counseling to address some of the issues in the relationship."

We thus disagree with father that the juvenile court's decision here is akin to that in *In re C.W.* (2019) 33 Cal.App.5th 835 (*C.W.*). There, on a mother's appeal, the appellate court reversed the juvenile's court's orders terminating its jurisdiction over her teenage son and awarding sole custody to the father, who lived in Louisiana. (*Id.* at pp. 837, 867.) After terminating both parents' reunification services, the court had returned the son to father, a "convicted child sex abuser," who "participated in barely any reunification services [and] engaged in no sexual abuse counseling." (*Id.* at pp. 837–838.) The son's behavior had deteriorated while living with father, who eventually sent him to live in a group home. (*Id.* at p. 838.) Minor's counsel had opposed dismissal. (*Id.* at p. 848.) Not surprisingly, the reviewing court found it "baffling" that the juvenile court could find the conditions that originally justified jurisdiction no longer existed, especially given there was no evidence father ever received treatment to address his inappropriate sexual behavior,

28

and his son had begun to engage in such behaviors while in his care. (*Id.* at pp. 863–864.) The facts here are very different.

In short, the evidence did not compel a finding that the conditions justifying the court's assumption of jurisdiction of R.S. continued to exist—or would exist—if the court withdrew its supervision.

## 2. *The court did not abuse its discretion by awarding sole legal custody to mother*

"Section 362.4 governs the termination of juvenile court jurisdiction and related orders. The statute authorizes a juvenile court to make 'exit orders' regarding custody and visitation upon terminating dependency jurisdiction over a child." (*J.M.,* *supra*, 89 Cal.App.5th at p. 112, citing § 362.4, subd. (a); *In re Chantal S.* (1996) 13 Cal.4th 196, 203 (*Chantal S.*).)

"When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.' " (*In re T.S.* (2020) 52 Cal.App.5th 503, 513; accord, *J.M., supra*, 89 Cal.App.5th at p. 112.) "The court must be guided by the totality of the circumstances and issue orders that are in the child's best interests." (*J.M.,* at p. 112, citing *Chantal S., supra*, 13 Cal.4th at p. 201.) "Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, '[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . . Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.' " (*J.M.,* at p. 112, quoting *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712 (*Jennifer R.*) [no presumption

29

of joint custody at termination of jurisdiction]; accord, *Chantal S.,* at p. 206.)

We review custody orders issued under section 362.4 for an abuse of discretion. (*J.M., supra,* 89 Cal.App.5th at p. 113; see *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4 [court has broad discretion to make custody orders when it terminates jurisdiction].) "We will not disturb the juvenile court's decision ' " 'unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*J.M.,* at p. 113; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 319 [" ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "].)

Father contends the juvenile court abused its discretion in granting sole legal custody to mother, whom he describes as an "emotionally unhinged and manipulative parent." Father argues mother "acted against" R.S.'s best interests throughout the case, citing evidence similar to that he cited in his challenge to the order terminating jurisdiction. Father notes DCFS had reported mother "took no responsibility for her conduct and 'appeared to blame all of the children's behavioral concerns on the influence of father and Scarlett.' " Father contends he, in contrast, consistently acted in R.S.'s best interests. Father notes he respected R.S.'s wishes to live with mother and her decision as to whether to visit father.[8] He complied with his case plan and, in DCFS's view, "was demonstrating 'new skills and behaviors,' and posed 'no safety threat' to the children."

---

[8] Father does not contest the award of sole physical custody to mother or the visitation terms.

In essence, father is asking us to reweigh the evidence. We will not. (See *In re I.J.* (2013) 56 Cal.4th 766, 773 [reviewing court does not reweigh the evidence or exercise independent judgment in determining if sufficient facts support the findings].)

The court properly considered the totality of the circumstances, and the evidence supported the court's ruling. True, father was nonoffending—the court had declared R.S. a dependent based on mother's conduct alone. And as father asserts, he had complied with his case plan and neither DCFS nor minor's counsel had raised any safety concerns. The court was clear, however, that it was making its custody order with the best interests of R.S. in mind. The court noted R.S.'s progress in mother's care, particularly with respect to the stabilization of her mental health issues. The court also noted R.S. had made it clear to the social worker that she felt "safe under her mother's care, and that she would feel distressed and pressured if she [were] forced to have visits with her father."[9] At the hearing, DCFS's counsel said DCFS had recommended sole legal custody to mother in part because R.S. did not want father to be "involved in decision making processes for her." As DCFS notes, if the court granted father joint legal custody, he would be "involved in legal decisions" for R.S. when she did not want contact with him yet (except maybe to say "hello" in passing).

The court was clear that it did not want the stability R.S. had gained while in her mother's care "disturbed." The court reasonably could conclude giving father the joint "right and responsibility" to make decisions about R.S.'s "health, education,

---

[9] R.S. had not visited father since her removal from paternal grandmother's home in September 2024.

31

and welfare" (Fam. Code, § 3003) would cause R.S. distress—just as forced visits would—and could destabilize her mental health, a situation decidedly not in R.S.'s best interests.

Father again relies on *C.W.*, comparing mother to the father to whom the juvenile court granted sole custody in an abuse of its discretion. (*C.W., supra*, 33 Cal.App.5th at pp. 863–864, 866.) Again, the facts are inapposite. Contrary to the father in *C.W.*, mother here had participated in therapy and in her case plan and had created a stable home environment for R.S. After returning to mother's care, R.S. had had no behavioral issues and no safety concerns had arisen. (Cf. *id.* at pp. 864, 866.) Moreover, at the termination of jurisdiction hearing in *C.W.*, the child did not want to live with his father and wanted to return to his mother. (*Id.* at pp. 848, 866.) In contrast, R.S. wanted to stay in mother's custody and did not want to have contact with father. (See *id.* at p. 866 [noting that, although child's "preference is not determinative, it is 'powerful demonstrative evidence' that this would be in his best interest"].)[10]

Moreover, joint legal custody reasonably was not in R.S.'s best interests, despite father's nonoffending status and compliance with his case plan, given parents' very contentious relationship. Earlier in the case, the juvenile court had remarked on how "overwhelmed" R.S. was " 'with all of the animosity and all of the bickering surrounding her.' " DCFS also had concluded parents' "tumultuous relationship resulted in a custody battle

---

[10]     While that appeal was pending, the Louisiana dependency court asserted jurisdiction over the child and ultimately returned him to California to live with his mother. (*C.W., supra*, 33 Cal.App.5th at p. 838.)

that negatively impacted [R.S.] and [C.S.] and the relationship with their parents." More than once, DCFS mentioned the "division" or "discord" between the maternal and paternal sides. The evidence showed that each parent accused the other of alienating the children from him or her. Indeed, the court had to warn parents and the other involved adults not to disparage the other parent. The siblings' allegiances also appeared to be divided, with Zoe and Skylar supporting mother, and Scarlett and C.S. supporting father. R.S. was caught somewhere in the middle, stating parents "talk[ed] badly" about each other, and "she [didn't] know who to believe."

Considering the totality of these circumstances, the juvenile court reasonably could conclude parents' acrimonious relationship would, at best, make shared legal custody of R.S. infeasible, and at worst, negatively affect R.S.'s mental health. (See *Jennifer R., supra,* 14 Cal.App.4th at p. 712 ["the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions"].) That father may not have engaged in the type of bad behavior the noncustodial parents did in the cases father cites—where sole custody orders were upheld—does not render the court's decision not to give him joint custody an abuse of its discretion. (See *id.* at p. 704 and *In re Maya L.* (2014) 232 Cal.App.4th 81, cited by father.) The court was required to focus on the best interests of R.S. based on the totality of her specific circumstances. (*J.M., supra,* 89 Cal.App.5th at p. 112.) It did that. Considering those circumstances, we cannot find the court acted arbitrarily in granting sole legal custody to mother or that

the evidence did not support its decision.  There was no abuse of discretion.

## DISPOSITION

We affirm the juvenile court's orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.